**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**L & J EQUIPMENT CO., INC., Respondent,**

**United Mine Workers of America, Intervenor.**

**No. 83–3275.**

United States Court of Appeals, Third Circuit.

Argued March 6, 1984.

Decided Sept. 28, 1984.

Rehearing and Rehearing En Banc Denied Dec. 27, 1984.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Peter Bernstein, Karen J. Ward (argued), N.L.R.B., Washington, D.C., for petitioner.

Kelvin C. Berens (argued), Berens & Associates, Inc., P.C., Omaha, Neb., for respondent.

Michael Holland, Gen. Counsel, Kurt Kobelt (argued), Washington, D.C., for intervenor.

Before HUNTER and BECKER, Circuit Judges and HOFFMAN, Senior District Judge.*

* Honorable Walter E. Hoffman, Senior Judge for the Eastern District of Virginia, sitting by desig-   nation.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This case presents a number of questions concerning the propriety of an election in which the employees of L & J Equipment Co., Inc. chose the United Mine Workers of America ("U.M.W.") as their collective bargaining representative. The National Labor Relations Board seeks enforcement of its order directing L & J to bargain with the U.M.W. as the representative of L & J's mining employees. L & J has refused to recognize the U.M.W. as the representative of the employees, alleging that the election was rendered invalid by improper inducements offered by the union to the employees, improper electioneering on the part of a pro-union employee who was a member of an in-house organizing committee (IHOC), and an atmosphere of fear and coercion surrounding the election. A hearing examiner ruled that a new election was necessary because the U.M.W. offered an improper inducement, a post-election "victory" dinner dance, to L & J employees but rejected the other two claims. The Acting Regional Director of the Board reversed the hearing examiner and held the election valid. The Board ultimately affirmed the decision of the Acting Regional Director and ordered L & J to bargain. L & J contends that the Board failed to consider the evidence under proper standards, and that substantial evidence does not support the Board's decision.

We agree with the Board's rejection of L & J's contention that the promise of a dinner dance rendered the election invalid. However, we find ourselves in disagreement with the Board's approach to the other two claims. First, we find that the Board applied an improper standard to the question whether a member of an in-house organizing committee (IHOC) should be considered an agent of the union, and that this error may have affected the Board's resolution of the improper electioneering and "atmosphere of fear and coercion" claims. Second, we find that because the Board improperly applied its *Ideal Electric* rule, under which acts occurring prior to the filing of an election petition are deemed not to have affected the atmosphere surrounding the election, it inappropriately discounted a substantial act of violence—the burning of a company-owned truck in the driveway of a pro-management employee. The errors may have affected the Board's resolution of the claims. Given these conclusions, the petition for enforcement of the Board's decision will be denied, and the case will be remanded to the Board for reconsideration of the issues under the proper legal standards.

## I. FACTS AND PROCEDURAL HISTORY

L & J is engaged in the surface mining of coal. Its principal mining site is located in Hatfield, Pennsylvania, and it operates six satellite mines in other areas of Western Pennsylvania. In early August, 1981, the U.M.W. initiated efforts to organize L & J's mining employees, beginning with an informal meeting between organizers and a small group of employees on August 5. On August 10, 1981, a group of employees met with several representatives of the U.M.W., and an IHOC of approximately five employees was established.[1]

The IHOC's duties included serving as a liaison between the L & J employees and the U.M.W. organizers by explaining employee concerns and answering employee questions, organizing and soliciting support for the union, and urging employees to attend union meetings and join the union. Not only was the union involved in the formation of the IHOC, but the members

---

1. Mr. John DiBiase, a U.M.W. official, testified:
   Q: Are any structures set up among the employees?
   A: Yes.
   Q: Do you have a name for those structures?
   A: Yes. Well, first we set up what we call an in-house organizing committee and those are all chosen by employees of that particular company, or the company or the corporation. Once that is done then we know who to relate to and correspond with, and who helps them set up meetings, how we get involved with passing out literature, it is just a combined effort of the in-house organizing committee and organizers.

often received specific instructions from the union.[2] The IHOC also assisted the union in dispersing information to and organizing support at the satellite job sites.[3] Employee Keith Powley was chosen as chairman of the IHOC. Powley assumed many duties, such as receiving information from union organizers and dispersing it, in person or by telephone, to employees at other job sites.[4] Company employees would often approach Powley with questions about the U.M.W., because he was widely perceived as the IHOC member who knew the most about the union. None of the members of the IHOC were compensated by the U.M.W. for their organizing work on its behalf, although Powley did receive compensation from the union for his supervisory duties on election day.

A few days after the first meeting, a company-owned truck used by Camille Mikalik, who was generally considered to be a pro-management employee of L & J, was destroyed by a fire as it stood parked in Mikalik's driveway in Mt. Morris, Pennsylvania. Authorities determined that the fire had been deliberately set. The back of the truck was painted with the word "scab," presumably reflecting the arsonist's belief that Mikalik was opposed to the unioniza-

tion of L & J's employees. Word of this incident spread quickly, and employees at all of the L & J job sites became aware of it.

Three weeks later (on September 1, 1981), the U.M.W. filed a petition for an election. The Acting Regional Director set the election for November 4, 1981. During the month preceding the election, union organizers and the IHOC conducted an extensive campaign. Union organizers Isidore Virgili and Joseph Panek told employees of the advantages of unionization and discussed certain benefits, including strike benefits, that employees would receive if they unionized. Virgili and other union organizers also informed employees that, in the event of victory in the election, the U.M.W. would sponsor a dinner-dance for all employees and their spouses.

Approximately three weeks before the election, Mikalik was approached at a local bar by a man identifying himself as a union organizer. He urged Mikalik to join the union, telling him to "take care of number one" and "watch" himself. Mikalik relayed this conversation to Powley, who said that if Mikalik signed a union card and Powley told others in the union of this fact, Mikalik would not be bothered again.[5] Mikalik

---

**2.** Mr. Michael Ziegler, a laid-off employee, and a member of the IHOC testified:

Q: Did the Union representatives give you any instructions as to what you should or should not do, for example did they tell you to try to get people to sign cards for the Union.
A: It was generally understood that we employees were to try to sign these people up.
Q: Did any of the Union representatives tell you you should do that?
A: Yes, they told us we needed a certain quota, or percentage, and that we'd have to sign them up.

**3.** These sites were spread over three counties in Western Pennsylvania and were up to sixty miles from the main site in Hatfield. It was therefore difficult for the U.M.W. organizers to visit the sites regularly to talk with the workers, hence the role of the IHOC was enhanced.

**4.** Powley testified:

A: Since I traveled around to all the other jobs, they elected me because I had a chance to see more people.

Q: How is your duty as chairman different from the duty or responsibility or authority of any of the other people on the committee?
A: Well, basically, when I found out information I would call them .... because they were at other job sites. You see, I didn't get around to every job every day. You see, what we did was we broke it down and I could call them and then they could further call other people on their own line, toll free calls, and things like that. I was the center of the hub, you know, and then it just went out from there.

**5.** Mikalik testified:

A: ... Keith told me maybe to get those guys off my back, you know, sign a card, that he would be able to get me a card.
\*    \*    \*    \*    \*    \*
Q: Didn't he tell you the idea of signing a card, said that he would spread the word you had signed a card in order you wouldn't be harassed in any way?
A: This was to like if there was a union meeting, that is what I was—like Keith said he never heard it, about my name mentioned in

then agreed to sign a union card, and other employees soon became aware of Mikalik's signing.

During the period preceding the election, there were a number of conversations in which several pro-union employees and union organizers discussed with other employees the possibility of a strike at L & J. During one conversation, several employees mentioned that violence might occur in the event of a strike. Powley suggested to Mikalik that employees crossing any picket line at L & J might be risking personal injury from employees supportive of the U.M.W., and that, while the picketers might let a few employees cross the picket line without incident, if employees tried to cross the picket line after that, "it would be shame on them." Powley also told Mikalik that the strikers, or perhaps the union, planned to bring in "a radical bunch" from another mine in the event of a strike. There is no evidence that employees not involved in this particular conversation were told of this "radical bunch." In another conversation, which included Powley and several other employees, a pro-union employee told Charles D. Martin, the pilot of the company's helicopter, that the helicopter would not be permitted to cross the picket line. Mr. Martin responded that interfering with an aircraft is a "federal offense." In a subsequent conversation, Powley and other employees told Martin that they had spoken with an unidentified person and agreed that the helicopter would be let alone.

Additionally, in the period before the election, employee Donny Arbogast told other employees that he had received a threat that he would have his legs broken should he cross a picket line. While only scant evidence exists suggesting that Arbogast was so threatened, and the hearing examiner explicitly disbelieved his testimo-

ny, many of the employees evidently heard this rumor.[6]

Approximately one week to ten days before the election, a company-owned barn located several miles from L & J was totally destroyed by fire. The cause of the fire was never determined. As was the case with the burning of the company-owned truck though, L & J employees quickly became aware of the incident. Later during that week, Panek and Virgili had a brief conversation with several L & J employees during which Virgili stated, apparently in a joking fashion, that "if it [the election] doesn't go our way, I am going to shoot each one of you guys as you come down off that hill." The Sunday prior to the election, Russell Yoney, a relative of Powley but not an employee of L & J, called Mikalik and described some advantages of the U.M.W., admonishing Mikalik to "watch" himself.

The election occurred on November 4, 1981. While the voting was taking place at the Hatfield site, Michael Ziegler, a member of the IHOC, spoke for approximately 10 to 15 minutes with some employees as they stood in line to vote, and for another half an hour with several employees who were not in line. The content of the conversations could not be determined at the hearing. The Board Agent present at the balloting had not established a no-electioneering area and did not ask Ziegler to leave the voting area.

The U.M.W. won the election, 39 to 33. One ballot was voided because the voter, in addition to voting "No," wrote "KKK" on the ballot, and the hearing examiner concluded that this was an illegal identifying mark. On November 12, 1981, L & J filed objections to the election, alleging several violations, including improper electioneer-

---

a meeting, and he was going to tell the other guys, the organizers to get a hold of them and tell them, you know, to watch what they say.

**6.** IHOC chairman Keith Powley testified as follows:

Q: Where did you hear the rumor from?
A: It was all over the job there for a while.
Q: Before the election?
A: A couple days before that, yeah.
Q: That Donny Arbogasts legs would be broken?
A: Well, he was the one who was telling, asking people about it, that heard anything, and he finally came to me.

ing, misrepresentations of fact, improper inducements, and "act of threats and coercion" by the U.M.W.[7] On January 27, 1982 the hearing examiner conducted a hearing, after which he found that (1) the Board agent had properly voided the ballot marked KKK; (2) the U.M.W. had not threatened employees, and no atmosphere of fear and coercion surrounded the election; and (3) the union had not engaged in improper electioneering, because the members of the IHOC were not agents of the U.M.W. However, he concluded that the promise of a victory party constituted an impermissible inducement affecting the outcome of the election. He therefore recommended to the Board that the election be voided and a new election held.

Both the U.M.W. and L & J filed objections to the report. The Acting Regional Director issued a supplemental decision on April 16, 1982, in which he adopted the recommendations of the hearing officer with respect to all issues except the allegedly improper inducement. After finding that the promise of the dinner dance did not affect the outcome of the election, he certified that the U.M.W. had been duly elected the official representative of L & J's mining employees. On August 4, 1982, the Board declined to review the Acting Regional Director's decision.

L & J continued to refuse to bargain with the U.M.W., which thereafter filed a complaint seeking further relief. The Regional Director filed a formal complaint, charging that L & J's refusal to bargain was an unfair labor practice under sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (The "N.L.R.A."), 29 U.S.C. §§ 158(a)(1), 158(a)(5). L & J's answer admitted its refusal to bargain, but denied that the U.M.W. was the properly certified bargaining representative of its employees. A hearing before an Administrative Law Judge was noticed, but the Board transferred the proceedings to itself. On February 9, 1983, the Board granted the motion of its

General Counsel for summary judgment, finding that L & J had violated sections 8(a)(1) and 8(a)(5). The Board ordered L & J to (a) cease and desist from refusing to bargain with the union, (b) provide certain information to the union, (c) post a notice to employees that it will bargain with the union, and (d) report to the Board's Regional Director the steps it has taken in compliance with the order. *L & J Equipment Company, Inc.*, 266 N.L.R.B. No. 29 (1983). The Board then petitioned this court for enforcement of its order pursuant to section 10(e) of the NLRA, 29 U.S.C. § 160(e).

## II.  *SCOPE OF REVIEW*

█   The standard in this circuit for reviewing a conclusion of the Board concerning the impact of an incident on an election was stated in *Jamesway Corp. v. NLRB*, 676 F.2d 63, 69 (3d Cir.1982):

> In determining whether a particular incident so disrupted an election as to warrant setting the election aside, a court must satisfy itself that the Board's determination regarding the impact of the incident at issue is supported by substantial evidence on the record considered as a whole.

*Accord Medical Center of Beaver County, Inc. v. NLRB*, 716 F.2d 995, 997 (3d Cir. 1983). *See also Hickman Harbor Service v. NLRB*, 739 F.2d 214 (6th Cir.1984). This court cannot substitute its judgment for that of the Board merely because it might have reached a different conclusion had it considered the issues initially. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

█   The Board and the U.M.W. argue that this court may only vacate an order of the Board in an election case if the Board abused its discretion. They submit that *NLRB v. ARA Services Inc.*, 717 F.2d 57 (3d Cir.1983) (en banc) creates a new, more deferential standard of review for determinations by the Board concerning election misconduct.   *See also Amalgamated*

---

**7.**  L & J agreed at the hearing to withdraw the objection based on alleged misrepresentations

of fact by the union.

*Clothing and Textile Workers Union v. NLRB,* 736 F.2d 1559 (D.C.Cir.1984).[8] We believe, however, that ARA is distinguishable. ARA involved a review by this court of the decision of the Board, under its own rules, not to conduct an evidentiary hearing on the issues raised by ARA's challenge to an election. We held that, under those circumstances, the standard of review was for "abuse of discretion," and affirmed the Board's decision. A different standard is applicable when this court reviews the findings of the Board on specific factual issues. In making such findings, the Board is not exercising discretion, but making a determination of fact on the basis of evidence. In reviewing such findings, we must evaluate the evidence on which each finding was based, and determine whether the evidence supports that finding. In reviewing Board findings, the relevant standard is the substantial evidence test. 29 U.S.C. 160(e) and (f). On questions of law, of course, our review is plenary, although the Board is entitled to deference in applying the law because of its expertise in labor matters. *See ARA,* 717 F.2d at 66.

### III. *THE DINNER DANCE CLAIM*

L & J challenges the finding of the Acting Regional Director that the U.M.W.'s promise to hold a dinner dance for all employees in the event of a union victory did not unduly influence employees in voting. The record establishes clearly that union organizers made such a promise and that most employees knew about the promise before the election. L & J argues that the Acting Regional Director and the Board were incorrect in finding that this promised "dinner-dance" was analogous to a post-election "victory party," which is permissible under the prevailing caselaw, rather than to an impermissible pre-election "inducement."

■ The Board has, with good reason, adopted a policy against inducements made during the course of a union election.

The conditioning of the receipt of benefits on favorable election results is impermissible conduct for parties engaged in the election.

*Crestwood of Stockton d/b/a Crestwood Manor,* 234 N.L.R.B. 1097 (1978). The policy is rooted in the idea that an employee's vote should be governed only by consideration of the advantages and disadvantages of unionization in his or her work environment, and not by any extraneous inducements of pecuniary value. While we recognize that the holding of the dinner dance was conditioned upon a union victory, we believe that the characteristics of the party and the publicity surrounding it do not render it an improper inducement or benefit.

There are two reasons for our conclusion. First, we do not find it inherently suspicious that the U.M.W. offered to hold a party to celebrate the beginning of a new relationship with the employees. The "benefits" to be received, an evening of food, drink, and dancing, were not of a monetary nature. For this reason, we find *Crestwood Manor,* which invalidated an election based on the promise of a $100.00 raffle in the event of a union victory, inapposite. In contrast, a "promise to supply or the actual supplying of meals or alcoholic beverages

---

**8.** In *Amalgamated Clothing and Textile Workers,* the D.C. Circuit has adopted the type of extremely deferential standard for which the Board and the U.M.W. are arguing in this case. Given our analysis of the precedent in this court, we do not believe that we are free to adopt such a standard. Furthermore, although we agree that the Board is entitled to substantial deference in its evaluation of the facts of particular cases, and also in formulating rules by which to make such evaluations, we believe that the function of judicial review is best served by attempting to segregate "factual" questions from "legal" questions, and then applying the appropriate standard of review to each, rather than by applying a generalized "abuse of discretion" standard to the final result. In this case, we have identified two instances in which the Board applied improper standards of evaluation to important factual questions. Under such circumstances, we believe that it is more appropriate to remand the case to the Board for reconsideration under the proper standards, rather than affirming on the basis that the same result, if reached after application of the proper standards, would be sustained. Needless to say, we express no opinion on this last question.

at a party" should not necessarily be viewed as inimical to an atmosphere in which free choice can be made. *See Long Island College Hospital*, 244 N.L.R.B. 330 (1979) (promise of post-election "victory party" not objectionable conduct).[9]

Second, while the dinner dance could have involved a substantial outlay of money by the U.M.W., we do not believe that the promise of a one-night party, the effects of which would last no longer than the following morning, would substantially influence employees in a decision having a major effect on their working lives. The dinner dance, therefore, is not qualitatively different from the promised supplying of beer and whiskey allowed in *Movsovitz & Son, Inc.*, 194 N.L.R.B. 444 (1971). *See also R.H. Osbriak Manufacturing Company*, 114 N.L.R.B. 940, 942 (1955) (leaflet distributed on election day announcing party to be held in event of union victory held "legitimate form of campaign propaganda").

In sum, we cannot say that the Board, in viewing all the evidence concerning the degree to which the party was discussed during the campaign, erred in concluding that the victory party was truly meant to celebrate any victory and lay the groundwork for a productive union-employee relationship. We therefore affirm the conclusion of the Board that the promise of a victory party was not sufficient grounds to overturn the election.

## IV. *THE AGENCY STATUS OF IHOC MEMBERS*

Two of L & J's allegations concerning the propriety of the election—the electioneering claim and the claim that violence and threats of violence made prior to the election created a coercive atmosphere—turn in part on the agency status of the

members of the IHOC. The Board, in rejecting both allegations, concluded that the IHOC members were not agents of the union. This court has recognized a "broad principal-agent standard under 29 U.S.C. § 152(13)."[10] *Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000, 1006 (3d Cir.1981). We have not, however, directly addressed the issue of the agency status of members of an in-house organizing committee during a union election campaign. This case requires that we confront that question.

### A. *The Sources of Agency Law in Labor Cases*

Some courts have looked to the *Restatement (Second) of Agency* to assist them in formulating a standard concerning the existence of an agency relationship in labor cases. *See Tuf-flex Glass v. NLRB*, 715 F.2d 291, 296 (7th Cir.1983); *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir.1976). Under the *Restatement*, an agency relationship can be established by showing the presence of either actual authority or apparent authority in the agent to carry out acts on behalf of the principal. *Restatement (Second) of Agency* §§ 26, 27. Actual authority is created

> by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.

*Id.* § 26. Actual authority encompasses both express authority, where the principal directly grants authority to the agent, verbally or in writing, to do a particular act, and implied authority, where the principal's actions reasonably cause the agent to be-

---

**9.** Respondents argue that *Long Island College Hospital* is inapposite, claiming the promised post-election party there was not contingent on a union victory. We believe that any such promise is *prima facie* to be presumed contingent upon a victory, since the notion of a union-sponsored party in the event of a union defeat seems silly. No evidence from *Long Island College Hospital* suggests that the party there was an ad hoc, win-or-lose party to be held prior to

counting of the ballots. It thus remains indistinguishable from the instant case.

**10.** "In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed was actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13).

lieve he or she has such authority. Apparent authority, on the other hand, is created by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

*Id.* § 27. Apparent authority turns on the interpretation of the principal's actions by a third party—the party with whom the agent deals. A principal cannot, however, be held liable for all the unauthorized acts of an agent. The principal "is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result." *Id.* § 231 comment a.

The Board has adopted its own standard for determining whether members of in-house organizing committees who assist a union in organizing activities are "agents" of the union. The Board has consistently held that IHOC members are not, by virtue of their membership and work alone, agents of the union. *See The Cambridge Wire Cloth Company, Inc.*, 256 N.L.R.B. 1135 (1981); *accord ATR Wire and Cable Co.*, 267 N.L.R.B. No. 28 (1983): *Liberty House Nursing Homes, Inc.*, 236 N.L.R.B. 456 (1978); *Firestone Steel Products Co.*, 235 N.L.R.B. 548 (1978); *Tennessee Plastics, Inc.*, 215 N.L.R.B. 315 (1974), *enf'd.* 525 F.2d 670 (6th Cir.1975). The Board has also generally concluded that, when union officials take an active part in an organizational drive, the members of an IHOC are not agents of the union. *See Liberty House Nursing Homes, Inc.*, 236 N.L.R.B. at 457–58: *Firestone Steel Products Co.*, 235 N.L.R.B. at 550: *Georgetown Dress Corp.*, 214 N.L.R.B. 706, *enforcement denied*, 537 F.2d 1239 (4th Cir.1976): *Bufkor-Pelzner Division, Inc.*, 197 N.L.R.B. 950 (1972).

### B. *The Proper Standard for Determining the Existence of Agency*

In *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir.1976), the Fourth Circuit confronted the question whether IHOC members were to be considered agents of the union. The court stated:

We think the union is chargeable with the misdeeds under the principle of apparent authority. The committee members in the eyes of other employees were the representatives of the union on the scene and the union authorized them to occupy that position. While they may have exceeded their authority and, indeed, acted contrary to their express instructions, their acts were apparently within the scope of their authority, neither their misdeeds nor their authority were repudiated by the union, and their acts did not so far exceed their authority as to make obvious to the persons coerced and intimidated that the union would not ratify what was done.

537 F.2d at 1244. *See also P.P.G. Industries v. NLRB*, 671 F.2d 817 (4th Cir.1982) (IHOC acts as the "alter ego" of the Union). We believe that *Georgetown Dress*, consistent with the *Restatement*, focuses on the proper factors in determining whether an agency relationship exists. The critical questions are whether the union placed the IHOC members in a position where employees could reasonably believe that they spoke for the union on the question involved, and whether, in those instances where IHOC members may have gone beyond their authority, the union took action to repudiate any excessive or illegal actions or statements by the IHOC members.

■ The Board's standard does not address these questions. The Board's approach treats the agency status of the IHOC as a function of the "active participation" of professional organizers, in effect making the agency status of IHOC members turn on the presence of other agents (professional organizers), rather than on the authority conveyed on the putative agents or the impression created in the minds of third parties. In this case, for example, the Board concluded that the fact that professional organizers were involved in the campaign rendered the role of the IHOC members nugatory, in terms of agency relationship, in spite of the evidence

that much of the campaign was conducted by the IHOC members, particularly Keith Powley. The Board's standard also fails to differentiate between different types of actions taken by IHOC members, some of which may be authorized or apparently authorized and others of which may not be. Finally, the Board's test does not require the union to disavow actions or statements of its closest adherents in a company even though those statements may have an improper influence on other employees.

■ The primary argument against attributing much weight to the actions of third parties in determining whether an election is valid, i.e., that neither the union nor the company can control such actions, is simply inapplicable where IHOC members are involved. It is certainly within the competence of the union to instruct IHOC members on the limits applicable to campaign tactics in union elections, and IHOC members, if aware of the possible consequences of exceeding those limits, will generally comply with them. Furthermore, under the standard we announce today, the union can always repudiate a random act of violence or threat by an IHOC member.[11] We conclude, therefore, that the Board's jurisprudence on this subject is inconsistent with both the mainstream of agency law and the NLRA's goal of promoting employee free choice in union elections. Although we recognize that the Board is entitled to considerable deference in devising standards for evaluating conduct in connection with union elections, we believe that those standards must reasonably further the goal

of providing an atmosphere in which employees can make an unconstrained choice concerning unionization. The Board's standard for determining whether an IHOC member is an "agent" of the union unreasonably insulates the union from responsibility for actions which employees are likely to attribute to the union, by reason of the role in the campaign that the union has given to the IHOC. In this case, the Board's application of its standard resulted in a failure properly to consider whether the acts of IHOC members at issue in this case should be attributed to the union.

■ We believe that the following test creates a proper framework within which to analyze the question of whether a union should be held accountable for the acts of IHOC members:

1. The IHOC as a whole must possess actual or apparent authority to act on behalf of the union in assisting the union in the organizational drive or election campaign;[12]

2. The individual member of the IHOC whose conduct is at issue must be sufficiently active in the IHOC that he or she had actual or apparent authority to act on behalf of the IHOC.[13]

3. The acts of the IHOC member must fall within the scope of his or her role as a member of the IHOC.[14]

4. The union must not have taken adequate steps to repudiate acts which, although unauthorized, fall within the apparent authority of IHOC members.

**11.** We also reject the argument, frequently stated by the Board and the courts, that a certain level of violence and threats is inevitable in a "hard fought" union election. Not only is this rationale susceptible of application in a one-sided fashion—to excuse threats of violence by union adherents—but it has the effect of legitimizing such behavior, contrary to the clear purpose of the NLRA to promote elections in which employees can exercise genuinely free choice.

**12.** We do not address today whether the union should be held accountable for acts by an IHOC or its members where the IHOC or its members lack actual or apparent authority from the un-

ion, but instead act independently of the union and the union fails to repudiate their actions.

**13.** We thus decline to adopt a *per se* rule to the effect that all members of in-house organizing committees are agents of the union if the IHOC itself has actual or apparent authority.

**14.** Thus a union may be accountable for unauthorized acts of IHOC members if those acts are generally viewed by reasonable third parties as connected with the election campaign, and within the authority given by the union to that individual. *See NLRB v. Georgetown Dress*, 537 F.2d 1239, 1244 (4th Cir.1976); Restatement (Second) of Agency § 228.

We believe that this standard fulfills the mandate of Congress in dictating a broad principal-agent relationship in 29 U.S.C. § 152(13) and provides a clear guide to the Board in its fact-finding process. Moreover, it is consistent with our standard in *Zeigler* for evaluating the acts of employees who are not members of an IHOC or directly connected with the union.[15] Having formulated an appropriate test for evaluating the action of IHOC members, we proceed to examine the Board's findings concerning L & J's allegation of misconduct by certain IHOC members.

## V. *THE ELECTIONEERING CLAIM*

Respondent alleges that the conduct of Michael Ziegler, an employee and a member of the IHOC, in talking with other employees as they waited to cast their ballots on election day, constitutes improper electioneering. The Board has enunciated a specific prohibition on certain types of electioneering tactics:

> The potential for distraction, last minute electioneering or pressure, and unfair advantage from prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, with-

out inquiry into the nature of the conversations.

*Milchem, Inc.*, 170 N.L.R.B. 362 (1968). The Board has construed this *per se* rule, however, to apply only in the case of "literal union representation," i.e., last-minute conversations involving *agents* of the union. *See NLRB v. Klinger Electric Corporation*, 656 F.2d 76 (5th Cir.1981). Respondent contends that Ziegler, in his capacity as a member IHOC, was an agent of the U.M.W.

The Board determined that Ziegler was not an agent of the union. While we agree that, if Ziegler was not acting as an agent of the union, there is substantial evidence to support the Board's conclusion that his conduct did not constitute prohibited electioneering,[16] the Board applied an incorrect standard in evaluating Ziegler's agency status and we therefore remand to the Board for an appropriate determination, under the test we have announced, of whether Ziegler acted as an agent of the union at the polls on election day. If the Board concludes that Ziegler acted as an agent, then the *Milchem* rule is applicable.

## VI. *THE "ATMOSPHERE OF FEAR AND COERCION" CLAIM*

The goal of holding a representative election is to allow employees to

---

**15.** *Zeigler* stated that the union should be accountable for acts by such persons if "the union knew of any improper acts or failed to repudiate them." *Id.* at 1006.

**16.** The hearing examiner found that Ziegler engaged in conversation with employees in line for ten to fifteen minutes and then engaged in casual conversation with employees not on line. The record reveals no evidence that Ziegler was discussing the election with or soliciting support for the U.M.W. among the employees. Unless the *Milchem* test applies, we do not believe that this conduct constitutes prohibited electioneering. Several different standards have been articulated for evaluating acts or electioneering by non-agents.

The Fifth Circuit has declared that:
> acts not attributable to the union warrant setting aside the election if the acts disrupted the voting procedure or disrupted the atmosphere necessary to the exercise of a free choice in the representation election (citation omitted).

*NLRB v. Carroll Contracting & Ready-Mix*, 636 F.2d 111, 113 (5th Cir.1981). *See also Boston Insulated Wire & Cable Systems, Inc. v. NLRB*, 703 F.2d 876, 880–881 (5th Cir.1983). Similarly, the Tenth Circuit has adopted the following test for conduct by non-agents:
> ... whether such coercive and disruptive conduct occurred that the election is to be set aside because free choice of representation was impossible (citation omitted).

*Worley Mills, Inc. v. NLRB*, 685 F.2d 362, 366 (10th Cir.1982). The Board declared its own standard for such conduct in *Southeastern Mills, Inc.*, 227 N.L.R.B. 57, 58 (1976):
> In cases involving electioneering by non-parties at or near the polls, the Board considers the circumstances peculiar to the situation and determines whether the conduct at issue so substantially impaired the employees' exercise of free choice as to require that the election be set aside.

We need not formulate our own standard here, since Ziegler's conduct would clearly be permissible under any of these standards.

choose freely and fairly whether they want a union to act as their collective bargaining representative. *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 327, 91 L.Ed. 322 (1946). Such a free and fair choice is impossible if the atmosphere surrounding the election is poisoned by coercive conduct which induces employees to base their vote not upon conviction, but "upon fear or ... any other improperly induced consideration." *Zeiglers Refuse Collectors, Inc. v. NLRB,* 639 F.2d 1000, 1005 (3d Cir.1981). In ruling upon the fairness of an election, the Board's primary inquiry should be whether such an atmosphere exists, regardless of how it came about or who may have caused it. *Id.* The Board must weigh a variety of factors and arrive at a "final, articulated decision supported by substantial evidence." *Id.*[17] An election should be voided if a substantial possibility existed that the threats affected the outcome of the election. *Id.*

### A. *The Truck Fire*

The election campaign for a bargaining representative at L & J began with a violent incident which necessarily affected the atmosphere surrounding the election. The destruction of a company-owned truck in the driveway of a pro-company employee should have received great weight in determining whether the election was valid for four reasons. First, the record clearly reveals that Mikalik was supportive of the company's position in the representation election and was known among other employees to be favorable to management.[18] Second, the fire apparently occurred in early August, shortly after the union campaign began. It thus served as a type of early warning that the U.M.W. or some of its adherents were willing to resort to violence to gain the support of the employees. The act, occurring at the home of company supporter, might well be interpreted as having set the tone for the entire campaign. Third, the presence of the word "scab" on the truck creates a direct link between the incident and the question of unionization. The fire was not an act of random violence or personal vengeance, but rather was directed at Mikalik because of his opposition to the U.M.W.[19] Fourth, the record reveals that the destruction of the truck and the painting of the word "scab" were well known among the company's employees. Given the type of incident involved, it is fair to assume that nearly every employee knew of the arson. We believe the evidence suggests that the publicity surrounding the incident was enough to have created concern among employees about the consequences of not supporting the U.M.W.

The hearing examiner, in his evaluation of the truck burning, noted that the incident occurred prior to the filing of the U.M.W.'s election petition. He then cited the Board's *Ideal Electric* rule, under which evidence of misconduct occurring before the filing of the representation peti-

---

17. In *Zeiglers,* this court listed nine factors which should be included in the Board's consideration: (a) the number of threats; (b) the severity of the threats and whether they caused fear among the threatened; (c) the number of workers threatened; (d) the proximity of the threats to the election date; (e) the degree of persistence of the threats in the minds of employees; (f) the degree of circulation of the threats; (g) the effect, if any, of threats by the opposing side cancelling out the effect of the original threats; (h) the closeness of the final vote; and (i) the degree to which the threats can be attributed to union or management. Although we do not explicitly examine each of these factors in our opinion, the *Zeiglers* approach is implicit in our analysis. *Id.* at 1005.

18. For example, employee Archie Johnson gave the following testimony before the Board's Hearing Examiner:

Q. If Camille [Mikalik] had to be characterized, would you characterize him as a union [sic], pro union employee, pro company employee, or neutral?

A. Camille is a company man, that's all.

Q. Was that known among the men?

A. Yeah?

Q. Had it been known all along?

A. Pretty much so.

19. The Board has held that an atmosphere of fear and coercion may result even when threats are directed against one employee only. *Steak House Meat Company, Inc.,* 206 N.L.R.B. 28 (1973). *See also Hickman Harbor Service v. N.L.R.B.,* 739 F.2d 214 (6th Cir.1984).

tion is not considered by the Board in ruling on the fairness of an election. *Ideal Electric and Manufacturing Company,* 134 N.L.R.B. 1275 (1961). *See also N.L.R.B. v. Claxton Poultry Co., Inc.,* 581 F.2d 1133, 1135 (5th Cir.1978). Nevertheless, the hearing officer did not apply the rule strictly, for he later discussed the temporal importance of the incident, concluding that since the fire occurred prior to the filing of the petition and three months before the election, "the passage of time would tend to reduce the coercive effect of the incident." The Acting Regional Director, however, appears to have applied *Ideal Electric* more strictly. He emphasized the incident's remoteness in time and its occurrence before the filing of the representation petition and appears to have discounted the incident completely because it occurred prior to the filing of the petition.[20]

In our view, proper construction of the NLRA dictates that the *Ideal Electric* rule should not be applied woodenly. Indeed, the Board has not hesitated to ignore the rule's dictates in cases of particularly egregious misconduct prior to the filing date. *See Baker Machine & Gear, Inc.,* 220 N.L.R.B. 194 (1975) (discharge of leading union adherents prior to filing date is sufficient basis for setting election aside); *Willis Shaw Frozen Express, Inc.,* 209 N.L.R.B. 267 (1974) (stabbing and assaults prior to filing date must be considered); *Weather Seal Incorporated,* 161 N.L.R.B. 1226 (1966) (interrogation of, threats against, and dismissal of union activists prior to filing date grounds for new election). Moreover, the Board has not strictly adhered to the *Ideal Electric* rule when the pre-petition date conduct creates a coercive atmosphere which persists until the time of the election, *Servomation of Columbus,* 219 N.L.R.B. 504, 506 (1975), or when such conduct "lends meaning and dimension" to later conduct, *Dresser Industries, Inc.,* 231 N.L.R.B. 591 n. 1 (1977).

The courts have also taken a flexible attitude towards the *Ideal Electric* rule. The Ninth Circuit, in *NLRB v. R. Dakin and Company,* 477 F.2d 492, 494 (9th Cir. 1973) characterized it as follows:

> The rule is simply an evidentiary device calculated to render irrelevant upon a post-election contest, conduct "too remote" to have interfered with the employees' exercise of the free choice guaranteed by Section 7 of the Act... In a proper case such a rule undoubtedly serves a useful purpose. But if its predicate is lacking, then an indiscriminate application serves as a blanket exclusion of all evidence from consideration without regard to materiality... [W]e are not prepared to give our approval to a rule which flatly bars the consideration of all pre-petition misconduct...

*Accord, NLRB v. Anchorage Times Publishing Co.,* 637 F.2d 1359 (9th Cir.1981). *See also Catholic Medical Center of Brooklyn and Queens v. NLRB,* 589 F.2d 1166 (2d Cir.1978) (rejecting as arbitrary and capricious the Board's refusal to consider evidence of misconduct occurring between the filing of two representation petitions).

We agree with the Ninth Circuit's characterization of the *Ideal Electric* rule, and accordingly adopt it. The rule should be applied as a rule of thumb and convenience, and not used to exclude important evidence needed to evaluate misconduct. The fire in Mikalik's driveway was not remote from the subsequent election campaign, but rather was inextricably linked with it. We thus conclude that the Board placed undue weight on the fact that the fire occurred several weeks before the filing of the election petition. Common sense requires us to recognize that memories of such a violent act would not have disap-

---

**20.** The Acting Regional Director's opinion is, in effect, the opinion of the Board, since the Board declined to review it. As explained above, L & J refused to comply with the Board's first decision, in order to obtain judicial review. The Board's General Counsel then instituted unfair labor practice proceedings. The Board issued an opinion in these proceedings ordering L & J to bargain, in which it refused to deal with the substantive issues which had been raised by L & J in the first set of administrative proceedings. 266 N.L.R.B. No. 29 (1983).

peared before the election. Particularly where the election turned on only a handful of votes,[21] we cannot say that such an event had no effect upon the election. *See NLRB v. Mr. Porto, Inc.,* 590 F.2d 637, 639 (6th Cir.1978).

### B. *Post-Truck Fire Incidents*

We recognize that if the fire had been the only misconduct during the entire three-month campaign, the atmosphere of fear and coercion which resulted would probably not have persisted to election day. Under those circumstances, the election would have taken place under the required "laboratory conditions." *General Shoe Corporation,* 77 N.L.R.B. 124, 127 (1948); *Cross-Baking Company v. NLRB,* 453 F.2d 1346 (1st Cir.1971). We cannot, however, ignore the later incidents, which must also be viewed in light of the earlier arson. *See NLRB v. Claxton Manufacturing Company,* 613 F.2d 1364, 1371 (5th Cir. 1980). As the Eighth Circuit stated in *Bauer Welding and Metal Fabricators v. NLRB,* 676 F.2d 314, 318 (8th Cir.1982):

> ... [E]ven where an incident of misconduct, not insubstantial in nature, is insufficient by itself to show that an election was not an expression of free choice, two or more such incidents, when considered together in the totality of the circumstances, may be deemed sufficient to support such a conclusion.

The record indicates that at least four groups of incidents subsequent to the truck burning reinforced the impression that the union was willing to resort to violence, and thus may well have perpetuated the atmosphere of fear and violence until the time of the election. These were: a rumor circulated by employee Danny Arbogast that someone had threatened to break his legs if, in the event of a strike, he crossed the picket line;[22] the comments by members of the IHOC, including Keith Powley, concerning possible violence in the event of a strike; the threats against Mikalik; and the destruction of a company-owned barn by fire one week to ten days before the election.[23]

The evidence clearly indicates that member of the IHOC were responsible for one of these congeries of incidents, namely the implicit threats of possible violence in the event of a strike. Keith Powley, chairman of the IHOC, told Mikalik it would be "shame on them" if employees crossed a picket line, told him that a "radical bunch" from another mine would visit L & J sites in the event of a strike, and participated in another discussion concerning possible violence against the company helicopter.

In discounting this set of incidents, the Board relied heavily on the conclusion that neither the IHOC as a whole nor Powley were agents of the union. Given our rejection of the Board's analysis of the agency question, this conclusion must be reconsidered. Under the standard we have established today, the evidence on the record suggests that the actions of Powley may be attributable to the union.[24] If so, the Board must treat his acts as those of a union agent, both for the purpose of determining whether they were "coercive" and thus an unfair labor practice under. 29 U.S.C. § 158(a)(1) and (b)(1), and for the purpose of assessing their effect on the atmosphere surrounding the election.

---

**21.** A shift of three votes from union to management would have altered the outcome of the election.

**22.** *See supra,* note 6 and accompanying text.

**23.** No evidence was found to indicate that the fire was caused by arson.

**24.** Looking at the evidence in light of the four-pronged test: first, the U.M.W. assisted in the formulation of the IHOC, provided it with instructions on the organizational drive, and entrusted the IHOC with organizational duties at the various sites which the U.M.W. organizers could not handle alone due to the geographic dispersion of the sites; second, Keith Powley, as chairman of that committee, had authority to act on its behalf, performed a major role in the campaign, and was widely viewed by employees to be acting on behalf of the union; third, Powley's comments concerning violence fell within the ambit of his role as IHOC chairman; and fourth, the union apparently never repudiated these comments.

Union responsibility is not, however, the only factor the Board must consider in determining whether an atmosphere of fear and coercion permeated an election campaign. *See Zeiglers,* 639 F.2d at 1006. In this case, the Board must consider the impact of all the events subsequent to the truck bombing, regardless of the source of those acts. We recognize that acts attributable to third parties are not subject to the same level of scrutiny as acts attributable to the union or employer. *See NLRB v. ARA Services,* 717 F.2d 57 (3d Cir.1983) (en banc). Nevertheless, while there was no evidence that the U.M.W. was responsible for the rumor circulated by Donny Arbogast and no direct evidence that it was responsible for the threats against Camille Mikalik, or the barn fire, the occurrence of the acts themselves may well have contributed to an atmosphere of fear and coercion, for which the U.M.W. would be at least partially responsible. In that case, the election might have to be overturned because of a "general atmosphere among voting employees of confusion and fear of reprisal for failing to vote for or support the Union." *Zeiglers Refuse Collectors, Inc. v. NLRB,* 639 F.2d 1000, 1008 (3d Cir.1981) (quoting *Steak House Meat Co.,* 206 N.L.R.B. 28, 29 (1973)).

In making this determination, the Board must consider the cumulative effect of all of the incidents. The subsequent incidents must be interpreted in light of the truck arson, which indicated a willingness on the part of union partisans to use violence. The Board must realistically evaluate the likelihood that the subsequent events perpetuated the uneasiness caused by the truck fire. The Board must also realistically assess the relationship between the IHOC and the U.M.W. The Board must base its decision upon both the totality of the union's conduct, and the effect of that conduct, along with the other incidents which cannot be attributed to the union, or the L & J employees. *See NLRB v. Monark Boat Co.,* 713 F.2d 355, 360 (8th Cir.1983). Our holding in this case should not be read as departing from our long-held

view that the "laboratory conditions" test must be applied realistically. We continue to recognize that less-thanperfect campaigns do not always require setting aside an election. *Zeiglers,* 639 F.2d at 1005.

## VII. *CONCLUSION*

In sum, we hold that the Board failed to apply its *Ideal Electric* rule with appropriate flexibility, and failed to apply an appropriate test of agency for acts by members of the in-house organizing committee. We remand the case to the Board for further proceedings concerning L & J's claims of electioneering and the existence of an atmosphere of fear and coercion surrounding the election. The petition for enforcement will therefore be denied.