165 F.3d 928
 160 L.R.R.M. (BNA) 2299, 334 U.S.App.D.C. 141,
137 Lab.Cas. P 10,356
 FREUND BAKING COMPANY, Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.
Bakery, Confectionery, and Tobacco Workers International
Union, Local 119, AFL-CIO, Intervenor.
 No. 97-1694.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 11, 1998.
Decided Jan. 22, 1999.
 
 Ronald I. Tisch argued the cause for petitioner/cross-respondent. With him on the briefs was David S. Durham.
 Steven B. Goldstein, Attorney, National Labor Relations Board, argued the cause for respondent/cross-petitioner. With him on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and Margaret A. Gaines, Supervisory Attorney.
 Larry Engelstein argued the cause for intervenor Bakery, Confectionery, and Tobacco Workers International Union, Local 119, AFL-CIO. With him on the brief were Jonathan P. Hiatt, James Coppess, David Rosenfeld, Jeffrey R. Freund and Laurence Gold.
 Before: SILBERMAN, GINSBURG, and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 The National Labor Relations Board certified the Bakery, Confectionary, and Tobacco Workers, Local 119, AFL-CIO as the exclusive representative of certain employees of Freund Baking Company after the Union won a representation election. Freund nevertheless refused to bargain, asserting that the Union had impermissibly interfered with the election by providing free legal services to the employees shortly before voting began. The NLRB rejected this argument and held that the Company's refusal to bargain violated §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5). Freund petitions for review of the Board's order, and the Board cross-applies for its enforcement. For the reasons set out below, we grant review and deny enforcement.
 
 I. Background
 
 2
 In October, 1996 the Union filed a petition with the NLRB seeking certification as the exclusive bargaining representative of a group of 41 Freund employees. In November the Regional Director of the NLRB held a hearing to determine the appropriate bargaining unit. At the hearing, a union attorney elicited testimony from the president of the Company about its overtime pay practices. Shortly thereafter, Freund sent a letter to its employees acknowledging that it had failed to pay overtime in accordance with then-applicable California law. Freund assured the employees that its transgression had been inadvertent and that it would promptly pay all those to whom additional compensation was due. In December the Regional Director denied Freund's motion to dismiss the Union's petition and scheduled a representation election for January 30, 1997.
 
 
 3
 One week before the election four Freund employees sued the Company on behalf of all the workers in the proposed bargaining unit, alleging that Freund had failed to pay for overtime as required by California law. The employees were represented by David A. Rosenfeld, Esq., who, in addition to representing the Union in this action, has several times before represented employees filing lawsuits against their employers just before a representation election.
 
 
 4
 One day before the Freund election, Union representatives distributed to the Company's employees a flyer, stating in part:
 
 
 5
 [O]n January 23, 1997 a Class Action Law Suit was filed against Freund ... on behalf of all the employees to recuperate [sic] all wages owed to you.
 
 
 6
 Freund ... has been in business for many years, THERE IS NO excuse for them to steal from the Workers. The wage and hour laws have been in affect [sic] for many years. It's Freund [sic] obligations [sic] to know and to respect the laws.
 
 VOTE FOR YOURSELF
 
 7
 VOTE UNION YES!
 
 JUSTICE-DIGNITY-RESPECT
 
 8
 UNION YES!
 
 
 9
 Employees in the proposed bargaining unit returned 20 votes for and 15 against the Union. Seven ballots were challenged either by Freund or by the Union. The Regional Director, rejecting Freund's argument that the Union had impermissibly interfered with the election by sponsoring the employees' lawsuit against it, resolved enough of the challenges to determine that the Union had won. The Board affirmed the Regional Director's decision.
 
 
 10
 When Freund nevertheless refused to bargain, the Union filed an unfair labor practice charge against the Company. The General Counsel issued a complaint and moved for summary judgment before the Board, which granted the motion and ordered Freund to recognize the Union as the exclusive representative of the bargaining unit employees. Freund now petitions this court for review of the Board's order, repeating its claim that the Union's participation in the lawsuit tainted the election.*
 
 II. Analysis
 
 11
 In reviewing the Board's decision we accept its findings of fact if they are supported by substantial evidence on the record considered as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We defer to the Board's construction of the NLRA if it is reasonably defensible, "though not if the Board failed to apply the proper legal standard." Noel Foods v. NLRB, 82 F.3d 1113, 1117 (D.C.Cir.1996).
 
 
 12
 The Board's principal duty in conducting a representation election is "to insure the fair and free choice of bargaining representatives by employees." NLRB v. Savair Mfg. Co., 414 U.S. 270, 276, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). The Act is studiously neutral upon the merits of unionization, see id. at 278, 94 S.Ct. 495; its mandate to the Board is that elections accurately ascertain employees' sentiment on the question of representation. As both the Board and the courts have long recognized, this goal cannot be achieved when either the employer or the union engages in campaign tactics that induce workers to cast their votes upon grounds other than the advantages and disadvantages of union representation. For example, an employer may not promise its employees a benefit, such as vacation or seniority, contingent upon the union's defeat in an upcoming election. See NLRB v. Flomatic Corp., 347 F.2d 74, 76-77 (2d Cir.1965). And in the critical period between the filing of a certification petition and the holding of an election, an employer may not grant an unconditional benefit unless it has a legitimate business reason for doing so. See Torbitt & Castleman, Inc. v. NLRB, 123 F.3d 899, 908-09 (6th Cir.1997); St. Francis Fed'n of Nurses and Health Professionals v. NLRB, 729 F.2d 844, 850-51 (D.C.Cir.1984). Nor may an employer cancel a planned wage increase in response to a union's organizational effort, lest employees reject the union out of fear of further retaliation. See GAF Corp. v. NLRB, 488 F.2d 306, 308-09 (2d Cir.1973).
 
 
 13
 Just as the Act prohibits an employer from using threats or rewards as campaign tactics, it bars both crude and subtle forms of vote-buying on the part of the union. For example, a union is prohibited not only from blatantly giving an employee anything of value in exchange for his support, see Plastic Masters, Inc. v. NLRB, 512 F.2d 449 (6th Cir.1975) (union tainted representation election by making excessive payments for time lost from work and for expenses incurred in aiding union's organizing effort), but also from unconditionally providing a benefit in a way that tacitly obliges the employee to vote for it. See Savair, 414 U.S. at 277-78, 94 S.Ct. 495 (union tainted election by waiving initiation fee for employees who signed "recognition slips" because those who signed solely to obtain waiver might feel morally obligated to vote for union). Applying the latter rule, the Board has held that a union may not give voters anything of "tangible economic benefit" during the critical period before an election. Mailing Servs., Inc., 293 N.L.R.B. 565, 565-66, 1989 WL 223947 (1989) (medical screenings); Wagner Elec. Corp., 167 N.L.R.B. 532, 533 (1967) (life insurance). Even when such gratuities are offered upon the same terms to employees who make no pledge of support, the Board has explained, they impose upon voters an implicit "constraint to vote for the donor Union." Mailing Servs., 293 N.L.R.B. at 565.
 
 
 14
 Relying upon these principles, Freund argues that the Union's aid to the employees in bringing their lawsuit against the Company amounted to an indirect form of vote-buying in that the Union thereby gave the voters free legal services. This gift is just as likely as free medical screenings or free life insurance to have constrained employees to vote for the Union out of a sense of obligation rather than upon an assessment of the merits of union representation. Indeed, the only other court to have considered the issue concluded that a union's pre-election filing of a lawsuit on behalf of employee-voters violated the rule against giving gratuities to voters. See Nestle Ice Cream Co. v. NLRB, 46 F.3d 578 (6th Cir.1995). In the present case, moreover, the Union first publicized the lawsuit on the day before the election, which greatly increased the likelihood that it would interfere with the employees' free choice.*
 
 
 15
 Such is Freund's argument. Before considering the merits of Freund's legal position, we pause to address the Union's challenge to its factual underpinning.
 
 A. The Union's Participation in the Lawsuit
 
 16
 As the Union observes, there is no definitive evidence linking it to the filing of the suit against the Company. True, both the employee plaintiffs in that suit and the Union here are represented by Mr. Rosenfeld; and yes, the Union used the suit to argue its case for election in the flyer it distributed to Freund's employees. Although both facts suggest that the Union sponsored the suit, they do not "establish either that the Union in fact did finance the litigation, or, if it did, ever publicized that assistance to the employees." Therefore, the Union contends, Freund has failed to prove that, even under the Company's view of the law, the Union "provided an objectionable benefit" to the employees before the election.
 
 
 17
 This argument need not detain us long. If the Union was not responsible for the suit, it certainly encouraged voters to believe it was: The Union announced the suit in a campaign flyer consisting exclusively of pro-Union and anti-Freund commentary and ending with the slogan "Union Yes!" Employees reading this flyer could not have failed to get the message that they had the Union to thank for their legal representation. That the flyer does not itself prove Union sponsorship of the suit is immaterial; it is the appearance of support, not the support itself, that may have interfered with the voters' decisionmaking.
 
 
 18
 Indeed, in the post-election proceeding upon Freund's objections, the Regional Director referred to the Union itself as having filed the lawsuit. The record does not indicate that the Union ever disputed that characterization before the Regional Director or filed a conditional cross-exception to it before the Board. Therefore, we treat the Union's responsibility for the suit as having been conclusively established.
 
 B. The Significance of the Union Lawsuit
 
 19
 The Board, in contending that the Union's filing of the lawsuit did not taint the representation election, does not deny that the Union provided free legal services to voters; nor does it suggest that the filing of the suit may not have affected the outcome of the election. Instead, invoking its own prior decision in Novotel New York, 321 N.L.R.B. 624, 1996 WL 384240 (1996), the Board contends that the Act permits a union to sue an employer on behalf of its employees prior to an election because such conduct is relevant to the "critical question facing employees in the election: namely, whether the union can improve working conditions." The Board also argues that a contrary holding would discourage unions from engaging in activity protected both by the Act and by the First Amendment to the Constitution of the United States.
 
 
 20
 1. Bearing of a Lawsuit upon the Merits of an Election
 
 
 21
 The Board's primary claim is that the Union's filing of the suit demonstrated the vigor with which it would defend the rights of Freund's employees and therefore enabled those employees to cast more informed votes. Even more to the point, according to the Board, the suit gave Freund's employees an opportunity to evaluate the Union's ability to improve the terms of their employment: "Such assistance can demonstrate that the union knows how to improve working conditions in the plant, is capable of doing so, and is willing to do so."
 
 
 22
 We agree that a union's willingness to prosecute a suit designed to insure that the wages paid to potential members are legally adequate is at least relevant to the question whether its election would benefit the employees. See NLRB v. L & J Equip. Co., 745 F.2d 224, 231 (3d Cir.1984) ("[A]n employee's vote should be governed ... by consideration of the advantages and disadvantages of unionization in his or her work environment"). Indeed, in the abstract we suppose that anything a union does or has done--its track record, so to speak--may be relevant to the merits of a representation election insofar as it helps employees to evaluate the likelihood that representation by a particular union will improve those conditions.
 
 
 23
 This only shows, however, that the Board's reasoning proves too much: It is equally applicable to any number of other gratuities that a union might want to give employees in the pre-election period, including the specific medical and life insurance benefits, the gift of which the Board has held is forbidden by the Act. Like free legal services, medical and insurance benefits are at least relevant to the union's claim that it is willing and able to provide the employees with more desirable working conditions. Nonetheless, although a union is free to advertise the benefits for which its members are eligible, it may not give voters "free samples" of health or insurance benefits before an election. See, respectively, Mailing Servs., 293 N.L.R.B. at 565-66, and Wagner, 167 N.L.R.B. at 533. The Board's attempt to distinguish free legal services therefore fails.
 
 
 24
 Moreover, filing a lawsuit prior to an election is hardly, by itself, probative on the question whether "the union knows how to improve working conditions in the plant, is capable of doing so, and is willing to do so." Indeed, the lawsuit may be meritless, even frivolous, for all one can tell merely from its having been filed. In the Nestle case, for example, the preelection suit was dismissed (after the election) for failure to state a claim. When the union filed an amended complaint and the employer again moved to dismiss and added a request for sanctions, the union agreed to withdraw its complaint with prejudice in exchange for the employer's withdrawing its motion for sanctions. See 46 F.3d at 580. We express no view upon the merits of the union-sponsored lawsuit involved in this case, of course: Like Freund's employees, we are in no position to make any informed judgment on the subject. Our point is only that the Board's first reason for rejecting Freund's objection does not withstand scrutiny.
 
 2. Section 7
 
 25
 The Board next suggests that a union's suit against an employer on behalf of voters in a representation election is both protected by § 7 of the Act and "consistent with labor's historical role of helping employees to improve their working conditions." As the Board points out, unions frequently (and uncontroversially) file unfair labor practice charges against employers in the pre-election period; indeed, in some cases they may even recover money for the employees as a result. Furthermore, according to the Board, a union's effort to advance the interests of employees through litigation deserves special solicitude because it is among the "core" activities protected by § 7.
 
 
 26
 The Board's argument here misses the point being pressed by Freund. Although the Board is certainly correct that a union may file an unfair labor practice charge against an employer during the critical period before an election, the purpose of such a charge is to prevent an employer's unfair labor practice from inhibiting employees in the exercise of their right freely to vote for or against union representation. The ensuing litigation is not the cause of the problem; it is the cure. GAF Corp., which the Board itself cites in this regard, is a good example. There the employer had canceled a planned pay increase when the union began its campaign to organize the employees. See 488 F.2d at 307-08. The union filed an unfair labor practice charge and the Board (which was later upheld by the court of appeals) ordered the employer to restore the status quo ante by granting the planned pay increase. See id. at 308-09. The Union had to initiate litigation in order to prevent the employer from "plac[ing] the onus on the Union for the loss of the increase" and thereby interfering with the employees' electoral choice. Id. at 309. Litigation necessary to protect the electoral process, however, cannot be equated with litigation intended improperly to influence the voters.
 
 
 27
 The same point answers the Union's argument that the service it rendered by filing the suit is no different from other legal services unions are unquestionably allowed to provide to employees in the critical period before an election, such as "present[ing] a case in support of the petitioned for bargaining unit and ... respond[ing] to the employer's objections to the election results." Like a charge that an employer is conducting an unlawful campaign against union representation, such issues often have to be resolved before a valid election can take place: If the bargaining unit is not defined correctly, for instance, some employees may be improperly (dis)enfranchised. Unlike an unfair labor practice charge, however, the lawsuits at issue here and in the Nestle case were not integral to the conduct of a fair election.
 
 
 28
 Nor is there weight to the Board's argument that the Union's lawsuit is unobjectionable because suing an employer is at the "core" of the activity protected by the Act. No party to this case has expressed any doubt that a union may, pursuant to § 7, file a lawsuit in its representative capacity. Cf. Eastex, Inc. v. NLRB, 437 U.S. 556, 565-66, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978) ("[I]t has been held [by the lower courts and by the Board] that the 'mutual aid or protection' clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums"). The issue here is whether the Union improperly influenced the impending election by gratuitously bringing such a suit on behalf of employees it did not yet represent.
 
 
 29
 Under the Act contestants in a representation election are routinely prevented from exercising certain rights during the brief time when their exercise might interfere with the voters' free choice. For example, although an employer may in ordinary circumstances increase its employees' pay at will, it may not grant a previously unscheduled raise during the critical period prior to an election. See St. Francis Fed'n of Nurses and Health Professionals, 729 F.2d at 850-51. Similarly, while the § 7 right of employees to "engage in ... concerted activities for the purpose of ... mutual aid or protection" would appear to cover a union's provision of medical and insurance services even to non-member employees, see Harvest Communications, Inc., 321 N.L.R.B. 40, 42, 1996 WL 209600 (1996), as we have seen, the Board has nevertheless held that a union may not give such services to voters during the critical pre-election period. See Mailing Servs., 293 N.L.R.B. at 565-66; Wagner, 167 N.L.R.B. at 533. It does not follow, therefore, that because a union ordinarily has the right under § 7 to sue an employer, it must have the right to do so in any and all circumstances. Because the Board's undifferentiated view of a union's right to sue on behalf of non-member employees ignores the employees' and the employer's countervailing interest in a free and fair representation election--an interest the Board has zealously protected in analogous situations--its decision cannot be upheld under § 7.
 
 3. The First Amendment
 
 30
 Though it stops short of arguing that the Constitution forbids it from limiting in any way a union's ability to file a pre-election lawsuit on behalf of non-member employees, the Board does suggest that overturning the election in this case would have first amendment "implications," to which it must be sensitive. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). In support of this argument, the Board points to NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), in which the Supreme Court held unconstitutional a state antisolicitation law that would have severely limited the ability of the NAACP to help potential litigants, including persons unaffiliated with the organization, file school desegregation lawsuits. See id. at 420, 428-29, 83 S.Ct. 328.
 
 
 31
 We shall assume arguendo that the Union had a first amendment interest in filing the suit against the Company--although the Union itself does not assert such an interest in this case. As Freund points out, the Board again, as it did in its § 7 argument, fails utterly to come to grips with the proposition that, because of the need for an atmosphere amenable to rational decisionmaking, the parties to a representation election do not retain their full panoply of rights during the critical period. For instance, an employer unquestionably has a right, protected by the first amendment, to express inflammatory views on social issues, such as race relations. When it expresses those views shortly before a representation election, however, the Board may conclude that this otherwise protected activity impermissibly interfered with the employees' right to a free and fair vote. See Sewell Mfg. Co., 138 N.L.R.B. 66, 69-72 (1962); see also NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) ("Any assessment of the precise scope of employer expression ... must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in [the Act]"). So, too, a union organizer, who ordinarily has a constitutional right to speak to employees regarding the benefits of unionization, see Thomas v. Collins, 323 U.S. 516, 532, 65 S.Ct. 315, 89 L.Ed. 430 (1945), may not engage in a prolonged discussion with a voter in the polling area. See Milchem, Inc., 170 N.L.R.B. 362, 362-63 (1968).
 
 
 32
 Without disavowing its earlier decisions that limit much expressive activity in the period prior to a representation election, the Board here argues that one form of such activity--the filing of a pre-election lawsuit by a union on behalf of non-member employees--cannot be compromised even where the effect is to confer upon voters an otherwise unlawful gratuity. This selective reasoning is, to say the least, not persuasive.
 
 III. Conclusion
 
 33
 The Union's sponsorship of the employees' lawsuit against the Company clearly violated the rule against providing gratuities to voters in the critical period before a representation election. We conclude that the Board's justifications for making an exception to the anti-gratuity rule for a union's provision of legal services is not based upon any reasonably defensible interpretation of the Act. Therefore, we hold the Board erred when it denied Freund's petition to set the election aside. Accordingly, Freund's petition for review is granted and the Board's application for enforcement of its order is denied.
 
 
 34
 So ordered.
 
 
 
 *
 Freund raises a number of other procedural and substantive objections to the Board's order. Specifically, it claims that the election should be set aside because the Board erroneously deprived it of an opportunity to present evidence on its motion to dismiss the certification petition and denied its request for a post-election hearing. Freund further claims that the election result should be invalidated because the Union improperly monitored the voting and distributed misleading campaign literature. Having considered the factual and legal bases for these arguments, we conclude that they are insufficiently meritorious to warrant discussion in a published opinion
 
 
 *
 We note that Mr. Rosenfeld represented the union and the employee plaintiffs in the Nestle case as well. There, too, the suit was announced to the employees the day before the election