**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MARS SALES & EQUIPMENT CO., Respondent.**

No. 79–2082.

United States Court of Appeals, Seventh Circuit.

Argued April 29, 1980.

Decided July 21, 1980.

---

Penny Pilzer, N. L. R. B., Washington, D. C., for petitioner.

Joseph A. Yocum, Yocum & Hahn, Evansville, Ind., for respondent.

Before WOOD, Circuit Judge, MARKEY, Chief Judge,* and CUDAHY, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

This appeal involves a National Labor Relations Board application for enforcement of its order dated June 13, 1979 issued against Mars Sales & Equipment Company (Company).[1]  The Board, substantially adopting the recommended order of the Administrative Law Judge,[2] concluded that the Company violated Section 8(a)(1) of the National Labor Relations Act (Act) by attempting to negotiate directly with Company employees; by soliciting grievances directly from an employee; by requesting information from an employee concerning what contract terms he wanted; by telling Company employees that the Company had discharged employees who engaged in a protected strike; and by telling a non-Union employee that the Company had offered better insurance and retirement benefits, and better wages to the employees if they would get out of the Union.  The Board also found that the Company violated Section 8(a)(1) and (3) of the Act by discharging striking employees Neaville and Metzger for engaging in a protected strike.  The issues on appeal are whether the Board's findings are supported by substantial evidence, whether the Board's remedy of reinstatement and back pay for Neaville and Metzger is proper, and whether the Board abused its discretion by asserting its jurisdiction in this case.

## Background

Mars Sales & Equipment is a small, seven-employee corporation involved in the

---

* Chief Judge Howard T. Markey of the United States Court of Customs and Patent Appeals is sitting by designation.

1. The Board's order is reported at 242 N.L.R.B. No. 149, 101 L.R.R.M. 1405 (1979).

2. The Board modified the ALJ's recommended order by requiring the Company to offer full reinstatement with back pay to Neaville and Metzger from the date of their discharge.  In all other regards the Board adopted the ALJ's recommendations.

nonretail sale, distribution, and service of food processing equipment. Located in Centralia, Illinois, the Company serves customers predominantly in two counties in southern Illinois. The Company is family owned and managed. The Company's stock is owned in equal shares by Nathan Rothschild, the Company president, and his wife Beverly, the Company's secretary-treasurer. Nathan, Beverly, and their son, David, constitute the Company's board of directors. David and his brother Jeff also serve as employees of the Company.

Two employees of the Company, Lenard Neaville, a warehouseman, and Victor Metzger, a truckdriver, were members of Teamsters Local Union 50, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union). The Company was under a duty to bargain with the Union with respect to this two-man bargaining unit. The collective bargaining agreement between the two-man unit and the Company expired on May 23, 1978. Neaville and Metzger began what the Company concedes was a protected economic strike on July 12, 1978.

### Section 8(a)(1) Violations

The events involved in this case occurred in the months prior to and during the strike of the Company. The ALJ found and the Board agreed that a variety of statements and other conduct of the Company during this period were unfair labor practices in violation of Section 8(a)(1) of the Act.[3] Our inquiry is limited to whether "on the record as a whole there is substantial evidence to support [the Board's] findings. . . . " *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

The ALJ and the Board found that the Company prior to the strike violated Section 8(a)(1) by attempting to negotiate directly with employees who were Union members, by soliciting an employee's grievances, and by inquiring and obtaining directly from an employee the contract terms he wanted, at a time when the employees were represented by an exclusive bargaining representative.

The record reveals that some time before the expiration of the agreement, employees Neaville and Metzger informed the Union what they desired in a new contract. Company president, Nathan Rothschild, later told Neaville and Metzger that the requested contract terms were unacceptable. Later still, as Neaville testified, President Rothschild stated to the two employees

that he didn't see why we needed the union, that he didn't like working through a third party, that he would draw up a contract between ourselves and take it to his lawyer and have it certified and notarized and everything, and we would just have our own individual contract, that there was no sense of us paying union dues to the union, the union wasn't doing us any good anyway, and that we wouldn't—that he wasn't going to agree with the union, that we was going to agree together first off before we talked to the union.

The record also reveals that President Rothschild told Metzger that he should bring his grievances directly to him before going to the Union.[4] Finally, there was testimony that President Rothschild asked employee Metzger what terms he desired in the contract. Metzger responded that he wanted more money and a retirement plan. This all occurred despite the Company's concession that it was under a duty to bargain with the Union as the employees' exclusive bargaining representative.

■ This conduct by the Company, which is based on testimony the ALJ and the Board relied on and credited, substantially supports the findings that the employer ig-

3. Section 8(a)(1) provides:
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title . . . . .
29 U.S.C. § 158(a)(1).

4. Nathan Rothschild had a somewhat different version, but the ALJ specifically credited Metzger.

nored the Union and negotiated directly with individual employees. It also supports a conclusion that the Company attempted to undermine the Union's role in the grievance procedure and impliedly promised a remedy, independent of Union involvement, for grievances. It is established that such conduct constitutes a violation of Section 8(a)(1), which forbids interference with the right of employees to bargain collectively through representatives of their choice and protects against interference with employees in their organizational efforts. *See Medo Photo Supply Corp. v. NLRB*, 321 U.S. 678, 684, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944) (ignoring bargaining representative); *NLRB v. Everbrite Electric Signs, Inc.*, 562 F.2d 405, 408 (7th Cir. 1977) (bargaining directly with individual employees); *NLRB v. Tom Wood Pontiac, Inc.*, 447 F.2d 383, 384–85 (7th Cir. 1971) (usurping union's role in grievance procedure). Therefore, we grant enforcement of these aspects of the Board's order.

The ALJ and the Board also found that the Company violated Section 8(a)(1) of the Act during the strike by telling employees that the striking employees had been discharged for engaging in the strike and by telling a non-Union employee of the Company that the striking employees had been offered better insurance, wages, and retirement benefits if they would get out of the Union.

The findings of these unfair labor practices were primarily based on the testimony of Diane Speakman, an accounts payable bookkeeper for the Company, who was not a Union member. The record reveals that shortly after the strike began, in letters dated July 18, 1978, the Company informed Neaville and Metzger that they were being released. Soon thereafter, Metzger, while picketing, met Speakman and told her that he had been fired. Nathan and Beverly Rothschild observed this discussion and, as Speakman walked away from Metzger, they asked her what she and Metzger had been talking about. Speakman told them that Metzger had said he and Neaville had been fired. Beverly Rothschild responded, "Yes, they have." On other later occasions Bev-

erly Rothschild repeated, in Speakman's presence, that the striking employees no longer worked for the firm. The record also shows that various members of the Rothschild family, on separate occasions, told Neaville and Metzger or one of them that they had been fired.

Two or three months after the strike began, Speakman commented to David Rothschild that she thought Metzger and Neaville were underpaid. David Rothschild responded that his father had offered them better insurance, wages, and retirement benefits if they would end their Union association.

The ALJ and the Board concluded that this conduct constituted a violation of Section 8(a)(1) because it interfered with employees' rights to engage in a protected strike and it threatened an employment discharge for engaging in union activity. The testimony indicates interference with an employee's decision to become a union member and substantially supports the Board's conclusion of a Section 8(a)(1) violation. Likewise, the statement that Neaville and Metzger were offered better employee benefits if they would terminate their relationship with the Union, indicated to Speakman that she would be better off without the Union. The suggestion that an employee will be better off by not joining a union constitutes an interference with the employee's freedom of choice for or against unionization and thus is violative of Section 8(a)(1). *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 459, 11 L.Ed.2d 435 (1964).

The Company argues that the ALJ's and the Board's crediting of and reliance on the testimony of Speakman, who referred to herself as a "brittle" diabetic, was improper, especially in light of the fact that the Rothschilds denied making the involved statements. This contention is without merit. The ALJ, who directly observed the witnesses and their testimony, specifically credited Speakman's testimony and discredited aspects of the Rothschilds' testimony. Credibility determinations, including assess-

ments of demeanor, are for the ALJ and the Board, not for a reviewing court. *Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1331 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978); *NLRB v. Townhouse T. V. & Appliances, Inc.*, 531 F.2d 826, 829 (7th Cir. 1976). Further, here documentary evidence in the form of discharge letters partially corroborates the challenged testimony. We will not disturb the credibility determinations of the ALJ adopted by the Board.

The Company also argues that statements made by anyone but Nathan Rothschild were not attributable to the Company because, as both Neaville and Metzger testified, Nathan was "the fellow who did the hiring and firing" at the Company. Therefore, the Company contends violations may not be based on statements by Beverly, David, and Jeff Rothschild.

The Supreme Court has indicated that where employees have just cause to believe that individuals were acting for or on behalf of management that those individuals' actions are attributable to the employer. *International Association of Machinists v. NLRB*, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940). This rule of law is based on a legislative policy of keeping the collective bargaining process free from an employer's influence and coercion. Strict application of respondeat superior principles would undermine this important policy underlying the Act. *Id.* If the record reveals that employees could reasonably think the acts of the agents were on behalf of management, then those acts are fairly attributable to the employer and may constitute a violation of the Act. *Id.; NLRB v. American Casting Service, Inc.*, 365 F.2d 168, 173 (7th Cir. 1966).

■ In the present case we feel that the Board's conclusion that the conduct of Beverly, Jeff, and David Rothschild is fairly attributable to the Company is supported by the record. All three were employees of the Company and closely related to Nathan. The Company was a small family corporation with Beverly and David sitting on the board of directors. Beverly Rothschild was the Company's secretary-treasurer as well as an owner of one-half of the corporation's stock. In addition, the fact that the actions of Nathan Rothschild in discharging Metzger and Neaville partially corroborate the conduct of the other Rothschilds substantially supports the conclusion that their conduct was attributable to the Company. *See NLRB v. Fiore Brothers Oil Co.*, 317 F.2d 710 (2d Cir. 1963); *Schwab Foods, Inc.*, 223 N.L.R.B. 394, 400–01 (1976), *enforced without opinion*, 549 F.2d 805 (7th Cir. 1977). We therefore enforce these aspects of the Board's order.

### Section 8(a)(1) and (3) Violation

■ The ALJ and the Board found that the Company violated Section 8(a)(1) and (3) of the Act by discharging striking employees Neaville and Metzger. As a general rule, employees engaged in an economic strike are entitled to reinstatement after the conclusion of the strike. *NLRB v. Transport Company of Texas*, 438 F.2d 258, 263 (5th Cir. 1971). If an employer can show a "legitimate and substantial business justification," however, it may refuse to reinstate economic strikers.[5] *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967). One such justification for refusing to reinstate is that an employer may hire permanent replacements to perform the strikers' tasks. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); *NLRB v. Wells Fargo Armored Service Corp.*, 597 F.2d 7 (1st Cir. 1979). The rationale for this exception to the general rule is that the employer's interest in continuing his business during a strike and the needed inducement of permanent employment to obtain replacements is a sufficient business justification overcoming protection for economic strikers. The replacements

5. In contrast, employees engaged in a strike in protest of an employer's unfair labor practices absent a statutory or contractual provision to the contrary are entitled to reinstatement with back pay even if permanent replacements have been hired. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956).

must be permanent at the time of the discharge, however, or the discharge and refusal to reinstate constitute an unfair labor practice. *NLRB v. International Van Lines*, 409 U.S. 48, 50, 93 S.Ct. 74, 76, 34 L.Ed.2d 201 (1972); *NLRB v. W. C. McQuaide, Inc.*, 552 F.2d 519, 531–32 (3d Cir. 1977). If an employer hires replacements without a commitment or understanding that the job is permanent and also discharges the strikers, the interest in protecting economic strikers by an entitlement to reinstatement is not overcome by a substantial business justification. The employer has not had to offer the jobs on a permanent basis as an inducement to continuing his operations. Hence, an economic striker whose job has not been permanently promised to a replacement at the time the striking employee is discharged is entitled to reinstatement. A determination of whether the job has been permanently promised is a question of fact which we will only review to see if it is supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 304 U.S. 474, 71 S.Ct. 456, 95 L.Ed.2d 456; *NLRB v. Murray Products, Inc.*, 584 F.2d 934, 939 (9th Cir. 1978).

In the present case it is conceded that the employees were engaged in a protected economic strike. The Company, by letters dated July 18, 1978, notified the two striking employees that it had hired permanent replacements for both of them and that the Company would no longer need their services. However, the ALJ and the Board found that the Company as of July 18 had not in fact hired permanent replacements and thus the discharge of the striking employees constituted an unfair labor practice.

The Company argues that the Board's conclusion that it had not hired permanent replacements is erroneous because the record reveals that David and Jeff Rothschild filled the strikers' jobs for more than a month until new employees were hired. The jobs were filled on a continuous basis from July 18th. The record reveals that during the strike David Rothschild replaced Neaville as a truckdriver. Prior to the strike, David worked for the Company as a salesman-in-training. After a replacement was hired in mid-August, David resumed his work as a salesman. Jeff Rothschild began work replacing Metzger as a warehouseman after the strike began. Jeff worked in the warehouse until late August or early September when a new employee was hired to fill that job. Jeff continued to work for the Company until late November.

Based on these facts the inference is warranted that the Company had not permanently committed either Metzger's or Neaville's jobs to replacements on July 18. The record is consistent with Jeff and David serving as temporary replacements during the earlier period of the strike. The fact that the jobs were filled on a continuous basis and that the jobs were eventually filled by permanent replacements does not affect the analysis. The jobs were not understood to be permanently committed to replacements on the day the strikers were discharged. Thus, the Company discharged the employees in violation of Section 8(a)(1) and (3). We enforce the Board's finding of unlawful discharges.

### The Remedy

The Board, reversing the ALJ, and relying on *Abilities & Goodwill, Inc.*, 241 N.L.R.B. No. 5, 100 L.R.R.M. 1470 (1979), ordered the Company to offer reinstatement to Metzger and Neaville with back pay from the date of their unlawful discharge to the date they received a valid offer of reinstatement.[6] The Company challenges this remedy as beyond the remedial purposes of the Act.

*Abilities & Goodwill* must be examined. In *Abilities & Goodwill* the Board overruled its longstanding method of treating unlawfully discharged strikers. Prior to *Abilities & Goodwill* the Board held that unlawfully discharged working employees were eligible for back pay from the date of their dis-

6. The Board, in agreement with the ALJ, also ordered the Company to cease and desist from a variety of conduct and to take other affirmative action. We enforce these other ordered remedies.

charge, but unlawfully discharged striking employees were eligible for back pay only after they had made an unconditional offer to return to work or after the strike was abandoned, unless evidence indicated it would be futile for an employee to ask to return to work.[7] In *Abilities & Goodwill* the Board, reasoning that unlawfully discharged striking employees should be treated the same as unlawfully discharged working employees, dispensed with the requirement that striking employees request reinstatement or abandon the strike before they become entitled to reinstatement and back pay. In a 3–2 decision, the Board held that such strikers are eligible to receive back pay from the date of their unlawful discharge until the employer offers them reinstatement. The rationale behind this new rule is that there exists an ambiguity when a striking employee is unlawfully discharged. On one hand, the employee may voluntarily be refraining from work, as evidenced by the fact that he was initially on strike, in which case a back pay award would more than make him whole for his unlawful discharge and thus would not be consistent with the remedial purposes of the Act. *See Republic Steel Corp. v. NLRB*, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940). On the other hand, the employee may not have returned to work because of the unlawful discharge, thinking it futile to even ask to be reinstated. In *Abilities & Goodwill* the Board reasoned that given this ambiguity the employer, who committed the unfair labor practice, should be responsible for back pay unless and until it indicated affirmatively that the unlawful discharge did not prevent the employee from returning to work by offering the employee reinstatement. The employer, after a court of appeals enforced the order, was free to show that the employees incurred a wilful loss of earnings in an attempt to mitigate damages.

In applying the rule to this case the Board ordered the Company, because it had not made valid offers of reinstatement, to offer reinstatement to Metzger and Neaville and back pay from the date of the unlawful discharges. The fact that Metzger resigned from the Company's employment on August 26, 1978, was deemed not to relieve the Company of its obligation to offer him reinstatement and back pay.

██ The Board's decisions as to the proper remedies for an unfair labor practice are accorded wide discretion. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed.2d 1271 (1941). But the remedies ordered must be consistent with the Act's essentially remedial and not penal purposes. *Republic Steel Corp.*, 311 U.S. at 10, 61 S.Ct. at 78; *NLRB v. Townhouse T. V. & Appliances, Inc.*, 531 F.2d at 830. Here, we think that, in ordering the Company to reinstate Metzger with back pay from the date of the unlawful discharge to the time the Company offered reinstatement, the Board has gone beyond the remedial purposes of the Act. As to employee Neaville, however, we enforce the Board's order.

The record reveals that on July 12, 1978 Metzger and Neaville went on strike because of their unhappiness over economic working conditions. After a week of the strike the Company unlawfully discharged both employees. The employees continued picketing the Company. More than a month later, on August 26, 1978, employee Metzger wrote the Company and stated, "This is to inform you that as of this date I am resigning from your employment." Neaville continued to picket the Company until December when he offered to return to work.

The ambiguity underlying *Abilities & Goodwill* concerning the reasons for not working exists as to employee Neaville. We think that an order of reinstatement and back pay from the date of the unlawful discharge for Neaville is consistent with the remedial policies of the Act and thus we enforce this aspect of the Board's order.

---

7. *See, e. g., Bartlett-Collins Co.*, 230 N.L.R.B. 144 (1977); *Roosevelt Roofing & Sheet Metal Works, Inc.*, 204 N.L.R.B. 671 (1973); *Sea-Way Distributing, Inc.*, 143 N.L.R.B. 460 (1963); *Wheatland Electric Cooperative, Inc.*, 102 N.L.R.B. 1119 (1953); *Massey Gin & Machine Works, Inc.*, 78 N.L.R.B. 189 (1948).

Metzger, however, is on a different footing. He clearly indicated he no longer wanted to be considered for employment with the Company. From the time of his letter indicating his resignation, the circumstances overwhelmingly suggest that Metzger voluntarily decided he did not wish to work for the Company. Ordering reinstatement and back pay for Metzger following his resignation would subject an employer to an award of back pay and reinstatement for not making the futile gesture of an offer of reinstatement to one who prior to his discharge voluntarily withheld his work product and after the discharge unequivocally indicated he no longer wanted employment with the Company.[8] Given these circumstances, we find that the burden must be placed on the employee to indicate he desires reinstatement. Placing this burden on the employer in such a case, given the futility of requiring the Company to offer reinstatement, would not serve the remedial purposes of the Act, but would punish the employer for its past conduct.[9]

### Board Jurisdiction

The Company next claims that the NLRB abused its discretion by exercising its jurisdiction in this case. It bases its claim on the fact that this was a very small company with only a two-man bargaining unit.

We find the Company's claim to be meritless. Congress has vested the Board with jurisdiction to the fullest extent constitutionally permissible under the commerce clause. *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963). The Board may limit the exercise of its jurisdiction but this decision is left to the Board's discretion. *Von Solbrig Hospital, Inc. v. NLRB*, 465 F.2d 173, 174 (7th Cir. 1972). The Board has established its own guidelines for the exercise of its discretion. *See Siemons Mailing Service,* 122 N.L.R.B. 81, 85 (1958).

Here, the Company does not dispute and in its answer to the General Counsel's complaint admitted that during the year ending September 30, 1978 the Company purchased goods and materials worth more than $50,000 from sources outside of Illinois. This exceeds the Board's self-imposed jurisdictional amount and sufficiently affects commerce to meet any congressional or constitutional limitation on Board jurisdiction. *See NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. at 226, 83 S.Ct. at 314 ("the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce"); *Siemons Mailing Service,* 122 N.L.R.B. at 85 ($50,000 inflow-outflow Board-imposed guideline to exercise of jurisdiction). Given that these standards were met in this case, we find the Board did not abuse its discretion by exercising its jurisdiction.

Accordingly, we deny enforcement of the provision of the Board's order which awarded Metzger an entitlement to reinstatement with back pay following his August 26, 1978 resignation letter. In all other respects, we grant enforcement of the Board's order. Each party shall bear its own costs.

Enforcement denied in part and granted in part.

8. The Board asserts that the Company should only be able to show that an employee voluntarily withheld his work product after we enforce their order during the course of further proceedings. We find the evidence of voluntariness weighs overwhelmingly in favor of the Company so as to make further proceedings, with all the risks involved therein, inappropriate. *Cf. NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953); *Phelps Dodge Corp. v. NLRB*, 313 U.S. at 200, 61 S.Ct. at 855.

9. The Board argues that our holding would preclude a striking employee from seeking to mitigate damages by taking another job following an unlawful discharge. We do not think this is the case. Metzger indicated clearly he did not desire to return to work. There is absolutely no indication in the record that he resigned in order to mitigate damages. An employee who seeks to mitigate damages by accepting alternative employment might create a different situation.