NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

AMERICAN LINEN SUPPLY COMPANY, Respondent.

No. 90–1467.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1990.

Decided Oct. 4, 1991.

Rehearing and Rehearing En Banc Denied Dec. 4, 1991.

Frederick Havard, Washington, D.C., argued (Jerry M. Hunter, Robert E. Allen and Aileen A. Armstrong, Washington, D.C., on brief), for petitioner.

William Harding, Lincoln, Neb., argued (Jack L. Shultz and Jerry L. Pigsley, Lincoln, Neb., and Cecil R. Hedger, Denver, Colo., on brief), for respondent.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and ARNOLD,* District Judge.

McMILLIAN, Circuit Judge.

The National Labor Relations Board (Board) petitions this court for enforcement of its order against American Linen Supply Company (American Linen or Employer).[1] The Board held that American Linen violated § 8(a)(1), (3), (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3), (5) (Act), by illegally discharging economic strikers; unlawfully supporting employee efforts to withdraw from United Food and Commercial Workers Union, Local 1116 (Union); and illegally withdrawing recognition of the Union. The Board, adopting the recommended order of the administrative law judge (ALJ),[2] ordered American Linen to reinstate the discharged workers with back pay, recognize and bargain with the Union, and post a notice at the Hibbing plant. American Linen challenges the enforcement of the Board's order. American Linen argues that the Board's order is not supported by substantial evidence because the ALJ drew improper inferences from the

---

* The Honorable Morris S. Arnold, United States District Judge for the Western District of Arkansas, sitting by designation.

1. *American Linen Supply Co.,* 297 N.L.R.B. No. 18 (Oct. 23, 1989).

2. *American Linen Supply Co.,* No. 18–CA–10346 (September 7, 1988) (decision of administrative law judge).

record, its actions in connection with the decertification petition were *de minimis* and non-coercive, it properly withdrew recognition from the union, and the economic strike was not converted into an unfair labor practice strike. For the reasons discussed below, we enforce the order of the Board.

## I. Background Facts

The Union has been the collective bargaining representative in the Employer's Hibbing, Minnesota, plant for about 20 years. The final two-year agreement between the parties expired December 31, 1986. Bargaining reached an impasse in January 1987 and a strike was threatened. On January 18, 1987, American Linen placed advertisements for potential replacements in the local papers. Applicants were interviewed and given tours of the plant. On February 6, 1987, American Linen posted a notice to current employees indicating that it would continue operations with permanent replacements should a strike occur and that no repercussions against striking employees would take place. The bargaining union members approved a strike in January to commence in February when the one month contract extension ended, but the strike never took place.

On September 30, 1987, the Union conducted a meeting at which members voted to strike. On the morning of October 2, 1987, when American Linen General Manager Edward Pajunen arrived at the plant at 6:15 a.m. he observed employees with picket signs around at the plant's entrances. He then spoke with Union President Burt Harstad and informed the striking employees that they could be permanently replaced. General Manager Pajunen then went inside to his office and returned outside the plant between 6:30 a.m. and 6:45 a.m. and distributed the following handwritten notice to the picketers:

10/2/87

To the Striking employees of American Linen–Hibbing

You have until 7 a.m., Fri. Oct.[3] 2nd to return to work. If you have not, you are permanently replaced.

You have the right to continue your hospitalization and medical coverage at your expense. Those forms will be given to you.

> Edward L. Pajunen
> District Mgr.

On October 6, 1987, employee Kathryn Extrum asked Personnel Manager Ruth Gustafson if there was something she could sign to get the Union out. Gustafson later handed Extrum a withdrawal card which stated:

U.F.C.W. Local # 1116

2002 London Road

P.O. Box 6388

Duluth, MN 55806

To Whom It May Concern:

I, <u>Kathy Extrum</u>, no longer desire to have Local # 1116 represent me as my bargaining agent, effective _____.

> Signed: _____

Gustafson told Extrum that she did not have to sign the document, but if she did, the form should be notarized by a Notary Public who was in the employee lunchroom. The Notary Public, Eugene Myer, was an officer of Security State Bank of Hibbing, where General Manager Pajunen was a director. Extrum testified that she saw numerous similar documents on the Notary's desk. Gustafson approached another employee Matthew Caroon, the Union's shop steward, and handed him a document similar to the one given to Extrum. Caroon told Gustafson that he did not want to sign the document and returned it to Gustafson. Twenty-six notarized employee statements, all notarized by employees of the Security State Bank, were sent certified mail to the Union, but it is unknown who paid the certified mail postage. The Union did not honor these statements, believing that they were employer-sponsored and not the free expression of the employees.

On the basis of these signed statements, American Linen withdrew recognition of

---

**3.** The month on the notice originally said "Sept.," but Pajunen corrected the month and distributed the corrected notice soon after the first one.

the Union on October 6, 1987. Two months later Extrum called the Board's regional office to discover if the Union had been decertified. The Board representative told her there was no record of any decertification, but sent her information relating to decertifying the Union and a decertification petition. Extrum typed the petition after working hours in Gustafson's office. Gustafson assisted Extrum with the petition by photocopying the employee withdrawal notices and giving Extrum information concerning the various classifications in the bargaining unit so Extrum could properly complete the petition. Extrum filed the decertification petition on December 30, 1987.

In January 1988, the Union filed unfair labor practice charges with the National Labor Relations Board under § 8(a)(1), (3), (5). The General Counsel of the Board filed a complaint endorsing the Union's allegations. An ALJ held a hearing and agreed with the General Counsel ordering American Linen to reinstate the striking employees with back pay because they had been unlawfully discharged in violation of § 8(a)(1), (3) and to recognize and bargain with the Union because the termination of striking employees unlawfully tainted the decertification process in violation of § 8(a)(1), (5). The Board affirmed, both on the grounds raised by the ALJ and on the additional grounds that (1) the withdrawal of recognition from the Union converted the strike into an unfair labor practice strike, and (2) the Employer's collection of withdrawal notices and aid to anti-Union employees independently "tainted" the decertification process and thus barred the withdrawal of recognition and decertification. The Board now asks this court for enforcement of the order.

## II.  Issues

In reviewing the Board's order, we must determine whether the Board correctly applied the law and whether its findings of

fact are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

### A.  Illegal Discharge of Striking Employees

■■■ The parties agree that the October 2nd picketers were economic strikers.[4] The right of the employees to engage in a lawful strike in support of economic demands is fundamental to the Act. *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963). In response, American Linen clearly has the right to hire permanent replacements. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). Yet, striking employees cannot be discharged until permanent replacements have in fact been hired. "[T]he discharge of economic strikers prior ... to the time their places are filled constitutes an unfair labor practice." *NLRB v. International Van Lines*, 409 U.S. 48, 52, 93 S.Ct. 74, 77, 34 L.Ed.2d 201 (1972), *quoting NLRB v. Globe Wireless, Ltd.*, 193 F.2d 748, 750 (9th Cir.1951); *see also NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567, 573 (7th Cir.1980) (*Mars Sales*); *NLRB v. Comfort, Inc.*, 365 F.2d 867, 874 (8th Cir.1966). Strikers remain employees and upon applying for reinstatement are entitled to reinstatement to their former or substantially equivalent positions if no permanent replacements have been hired and the positions remain open. *See NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967); *Laidlaw Corp. v. NLRB*, 414 F.2d 99, 103 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970).

■■■ In the instant case, the issue is whether the handwritten letter from Gener-

---

**4.** The Board describes the strike as an economic strike to protest the lack of a new contract with American Linen. American Linen asserts that

the strike is a sympathy strike for the Union at American Linen's Bemidji plant who went on

al Manager Pajunen [5] constituted an illegal termination prior to the hiring of permanent replacements. The Board found that this notice did illegally discharge the striking employees prior to the hiring of permanent replacements. American Linen correctly explains that the record contains no evidence as to when or whether any permanent replacements were in fact hired. The Board found it reasonable to infer from the circumstances that permanent replacements had not been hired by 7:00 a.m. on October 2, 1987. The Employer was not aware that the strike had begun until Pajunen arrived at 6:15 a.m., and less than thirty minutes elapsed between the drafting of the letter and the 7:00 a.m. deadline. While American Linen had prepared for a strike by accepting job applications and by preparing a list of supervisory personnel from other plants who could come to Hibbing to assist, there was not sufficient time in the early morning hours of October 2nd for these plans to go into effect. There is no evidence in the record to directly prove that replacements were not hired by 7:00 a.m., and American Linen asserts that record evidence, not mere suspicion, is necessary for the Board to prevail. In fact, the Board is entitled to look at the surrounding circumstances and circumstantial evidence to conclude that permanent replacements were not hired by 7:00 a.m. This evidence clearly shows that American Linen had not hired permanent replacements by 7:00 a.m., because Pajunen was hastily writing a termination notice to the strikers, not hiring replacements. Whether permanent replacements were hired by 7:00 a.m. is a question of fact [6] and the Board's conclusion is supported by substantial evidence.

■ Even if permanent replacements were not hired by 7:00 a.m., American Linen asserts that the notice from Pajunen to the striking employees did not constitute a discharge. The Board disagrees finding this notice did illegally discharge the strik-

ers. American Linen argues that if this court examines the surrounding circumstances as required by *Vulcan Hart Corp. (St. Louis Div.) v. NLRB*, 718 F.2d 269, 275 (8th Cir.1983), this letter would not appear to be a discharge letter. Instead, American Linen argues the letter is simply a misuse of the present tense instead of the future tense. In support of this proposition, American Linen cites this court's opinion in *L.A. Water Treatment, Div. of Chromalloy American Corp. v. NLRB*, 873 F.2d 1150 (8th Cir.1989) (*Chromalloy*). In *Chromalloy*, striking employees were sent a first letter which carefully detailed the employer's right and intent to hire permanent replacements as well as the rights of the strikers should permanent replacements be hired. In a second letter, the employer stated that permanent replacements had been hired and that the striker was "no longer employed." *Id.* at 1151. In determining "whether a reasonable person would have logically understood from the Company's actions that he was terminated," this court examined the second letter in context of the surrounding circumstances including the first letter. *Id.* at 1152. This court found that the second letter did not constitute a termination of the employees. American Linen analogizes the instant case to *Chromalloy*, arguing that when read in context of the February 1987 notice to employees, the October 2nd letter would not constitute a discharge. Furthermore, American Linen asserts that the employees themselves did not considered themselves terminated.

In the instant case, the notice concerning the chance of being permanently replaced was posted months before the strike, while the letter stating that the employees were permanently replaced occurred before permanent replacements were in fact hired. While in *Chromalloy* both letters were sent after the strike had begun, here the letter telling the employees they had been permanently replaced was delivered within

---

strike September 25, 1987. In either case, the October 2nd strike was an economic strike.

**5.** *See* notice to striking employees from Pajunen *supra* at 1430.

**6.** *See NLRB v. Mars Sales & Equipment Co.*, 626 F.2d 567, 573 (7th Cir.1980).

the first thirty minutes of the strike. Additionally, it is not the subjective beliefs of the striking employees that is relevant, but whether the letter from Pajunen "would logically lead a prudent person to believe his [or her] tenure had been terminated." *NLRB v. Trumbull Asphalt Co.*, 327 F.2d 841, 843 (8th Cir.1964), *quoting Putnam v. Lower*, 236 F.2d 561, 566 (9th Cir.1956). In the instant case, the strikers were told "you are permanently replaced,"[7] and a prudent person would believe this to constitute a discharge.

Thus, the letter to the striking employees on October 2nd did constitute a discharge and "an economic striker whose job has not been permanently promised to a replacement at the time the striking employee is discharged is entitled to reinstatement." *Mars Sales*, 626 F.2d at 573. American Linen finally argues that all of this is moot because the striking employees did not request reinstatement. American Linen is incorrect, however, because the reinstatement of unlawfully discharged employees is an allowable remedy even if "the employees did not request reinstatement or offer to return to work." *NLRB v. Tamara Foods, Inc.*, 692 F.2d 1171, 1183 (8th Cir. 1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983); *see also Mars Sales*, 626 F.2d at 574.[8] The Board's order for reinstatement with back pay for the illegally discharged strikers is thus enforced.

### B. Decertification and Withdrawal

■ The Board found that Personnel Manager Gustafson's assistance in obtaining signed employee union withdrawal statements[9] and with the decertification petition violated § 8(a)(1), (5) of the Act. The record shows that Gustafson solicited at least one employee, Caroon, to withdraw

from the Union and that twenty-six such withdrawal statements were signed. American Linen also provided work time to complete the statements and notary publics in the lunchroom to notarize the statements. It is unknown who paid the certified mail postage to send the statements to the union. Gustafson further assisted Extrum with the decertification petition by providing the use of her office, photocopying and providing information. American Linen argues that its assistance was only ministerial and any conduct was non-coercive and *de minimis*. The record, however, shows that American Linen actively supported the decertification effort. "It is a violation of Section 8(a)(1) of the Act for an employer to sponsor and participate in the circulation of a petition among employees withdrawing support from a union." *NLRB v. Allen's I.G.A. Foodliner*, 651 F.2d 438, 440 (6th Cir.1981).

■ American Linen's actions undermined the probative value of the withdrawal cards and violated the Act. During the first year, a union has an irrebuttable presumption of majority status. *Brooks v. NLRB*, 348 U.S. 96, 98–99, 75 S.Ct. 176, 178–79, 99 L.Ed. 125 (1954). After the first year, the presumption becomes rebuttable. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38, 107 S.Ct. 2225, 2233, 96 L.Ed.2d 22 (1987). This rebuttable presumption can only be rebutted by a good faith belief of the employer, based on objective factors, that the union has lost its majority status. *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, ——, 110 S.Ct. 1542, 1549–50, 108 L.Ed.2d 801 (1990). American Linen's illegal discharge of striking employees tainted its withdrawal of recognition from the Union. *Hearst Corp.*, 281 N.L.R.B. 764 (1986), *aff'd*, 837 F.2d 1088 (5th Cir.1988). Additionally, American Linen's illegal solicitation of withdraw-

---

**7.** *See* notice to striking employees from Pajunen *supra* at 1430.

**8.** American Linen relies on *Brookhurst Professional Bldg., Inc.*, 279 N.L.R.B. 1176 (1986) (*Brookhurst*). In *Brookhurst*, striking employees alleged that their employer refused to reinstate them despite their unconditional offer to return to work. The ALJ found that the union

never made such an offer. Thus, without an offer to return to work, the subsidiary issue of whether the striking employees had been permanently replaced was academic. *Brookhurst* did not involve termination prior to hiring permanent replacements, and thus American Linen's reliance on it is misplaced.

**9.** *See* sample withdrawal card *supra* at 1430.

al cards tainted its withdrawal of recognition because the withdrawal was based on the signed withdrawal cards. Furthermore, because the employer-sponsored withdrawal campaign immediately followed the illegal discharges on October 2nd, the entire decertification process was tainted by the illegal discharges. Thus, the Board properly dismissed the decertification petition.

### C. Conversion of Strike to Unfair Labor Practice Strike

The Board found that American Linen's unfair labor practices converted the economic strike into an unfair labor practice strike and that the strikers were thus entitled to reinstatement and back pay. Because the strikers obtained such relief pursuant to the Board's finding that they were unlawfully discharged, which this court has upheld, *supra* at 1433, this court need not address this issue.

Accordingly, we enforce the order of the Board.