**NOEL FOODS, A DIVISION OF NOEL CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 95–1096.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1995.

Decided May 3, 1996.

Gary E. Lofland, Yakima, WA, argued the cause and filed the briefs for petitioner.

David S. Habenstreit, Attorney, National Labor Relations Board, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Washing-

ton, DC, and Peter D. Winkler, Supervisory Attorney, were on the brief.

Before: GINSBURG, ROGERS, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

When the collective bargaining agreement between General Teamsters Local 524 and Noel Foods expired before the parties had agreed upon a new contract, the Union voted to strike. In the hours preceding the strike, a Company representative told employees that the Company had hired permanent replacements and that anyone who went on strike would be permanently replaced. Several weeks later, when the negotiations had reached an impasse over the reinstatement of the strikers who had been replaced, the Company implemented the terms of the last offer it had presented before the impasse.

The Board found that the Company's statements about permanent replacements were false when made, and held therefore that the employees who struck after hearing those statements had been unlawfully discharged. Furthermore, the Board held that the unlawful discharge of those employees infected the Company's claim to have bargained to impasse, so that it was unlawful for the Company to implement the terms of its final offer.

We conclude that the discharges were not unlawful because there is no evidence that any employee who heard the statements about replacements was not in fact permanently replaced as soon as he went out on strike; the supposed falsity of the statements did not itself bring about an unlawful discharge. As a result, the Company also did not violate its duty to bargain when it declared an impasse and unilaterally changed the terms of employment.

## I. Background

In the late summer of 1990 Noel Foods, a wholesale grocery distributor, and General Teamsters Local 524—which represented most of Noel's warehouse employees, along with its truck drivers, service personnel, and sales employees—were in the process of negotiating a new collective bargaining agreement (CBA) to replace the one that was due to expire on August 29 of that year. When that day arrived without the parties having agreed upon the amount that the Company would contribute to the employees' pension fund, the Union members voted to reject the Company's last offer and to strike at midnight.

Noel Foods was prepared for the strike. Shortly before the expiration of the CBA the Company had engaged an employment agency to screen, and to assemble a roster of, available replacement workers. The agency had run advertisements, received applications, conducted interviews, and thereby identified 20 qualified applicants. Just before 9:00 p.m. on August 29—after the employees had voted to strike and three hours before the strike was to begin—the management of Noel Foods asked the employment agency to supply as many replacement workers as possible by midnight. As a result, 15 replacement workers reported for work before the strike began.

In the meantime, the managers and supervisors of Noel Foods met to put into effect the contingency plan they had developed in anticipation of the strike, as part of which they telephoned employees in order to get some idea of how many would be walking off the job. Some of the employees thus contacted later testified that operations manager Rod Robbins told them that permanent replacements had been hired and that employees who struck would be permanently replaced.

Less than two hours before the scheduled strike, Robbins conducted a meeting with the night-shift employees. Later, at a hearing before an Administrative Law Judge, Robbins described his speech at that meeting as follows:

> [I told them] ... that the election had voted to go out on strike as of midnight, that *the company had hired permanent replacements,* and when you look at the things in life that go on—I kept going into my divorce—a strike is like water off a duck's back in things that can affect you in

life. The Noel Corporation was a very good company to work for. I also mentioned the fact that we were offering exactly what we offered prior to all this happening, the same contract agreement, the same benefits as far as whatever was offered on the table, the monies would be continued, that *the people that went out on strike would be permanently replaced— and that meaning sometime in the future when they went on strike*—that when you make this decision, don't worry about the group but make it as an individual decision because that's what counts is what you say to your kids and your family and your wife when you have to suffer a reduction in pay because of the strike.... At that point I was getting pretty emotional and started to break down and cry, and I think I left the room at that point. (Emphases added.)

At midnight, when the strike began, four of the night-shift workers who had attended this meeting walked off the job. The next day six of the day-shift employees who had received calls from Robbins joined the strike.

Formal bargaining resumed on September 10 as the strike continued. The Union demanded reinstatement of all strikers; the Company responded that some of the strikers had been permanently replaced and others were in the process of being replaced. The negotiations ultimately broke down over the Union's demand that the Company agree to reinstate all of the strikers, regardless of whether any had been permanently replaced. On September 18 the Company declared an impasse and implemented the terms of its final offer.

In December, with the strike still on-going and the negotiations suspended, supervisor Ed Shirley phoned Mitch Cruz, a striking truck driver, and offered him reinstatement. When Cruz asked whether the position would be union or nonunion, Shirley responded, "[I]t's a nonunion shop from now on." Cruz then refused to return to work.

Pursuant to an unfair labor practice charge filed by the Union, the General Counsel of the Board issued a complaint and a hearing was held. The ALJ concluded that Noel

Foods had not committed any unfair labor practice and dismissed the complaint.

On review the Board adopted the ALJ's findings of fact but nonetheless concluded that the Company had violated §§ 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA, 29 U.S.C. §§ 158(a)(1); 158(a)(3), 158(a)(5). *See Noel Foods*, 315 N.L.R.B. 905, 1994 WL 706201 (1994). First, the Board invoked its decision in *American Linen Supply Co.*, 297 N.L.R.B. 137, 1989 WL 224441 (1989), *enforced*, 945 F.2d 1428 (8th Cir.1991), in which it had held that an employer unlawfully discharged an economic striker when it falsely told him that he would be permanently replaced if he did not report for work at the beginning of the shift, less than one-half hour later. Comparing the statements Robbins made to employees both during the meeting and by telephone with the statement in *American Linen*, the Board found that the "message is the same in both cases: if employees join the strike ... they will be permanently replaced at that time." 315 N.L.R.B. at 907. After finding that Robbins's statements were false—that is, that Noel Foods "had not in fact hired permanent replacements for all the potential strikers" when he made these statements—the Board held that the ten strikers who heard the statements and then struck had been discharged in violation of § 8(a)(3). *Id.* at 907–09.

Second, the Board concluded that the deadlock in the negotiations was a direct result of the Company's unlawful discharge of the ten striking employees, so that the Company had not bargained to impasse in good faith. It followed that the Company violated §§ 8(a)(1) and 8(a)(5) when it unilaterally implemented the terms of its final offer. *Id.* at 910–11. Finally, the Board held that employee Cruz had been constructively discharged because Shirley's statement that Noel Foods was "a nonunion shop from now on" put Cruz to the impermissible choice of working or retaining his union representation, and he ultimately chose the latter. *Id.* at 909–10. The Board ordered the Company to reinstate the discharged employees, to rescind the changes in terms and conditions of employment it imposed after the purport-

ed impasse, and to post appropriate remedial notices.

The Company seeks review of the order, and the Board cross-petitions for enforcement. The Company argues first that when Robbins told employees at the meeting and over the telephone that they "would be permanently replaced" if they struck, he was merely informing them that the Company would exercise its legal right; the employees did not and could not reasonably have understood his statements as a notice of discharge. Moreover, Robbins's statement that the Company "had hired permanent replacements" was not false because the Company had, in fact, ensured that permanent replacements would be available at the beginning of the strike. Second, the Company argues that without the taint of the allegedly unlawful discharges, it can be seen to have negotiated to a valid impasse with the Union. Finally, the Company points out that the allegation that employee Mitch Cruz had been constructively discharged as a result of his supervisor's statement in December 1990 was not part of the charge filed by the Union, nor was it alleged in the General Counsel's amended complaint; the Company argues that the Board's holding that the Company unlawfully discharged Cruz is therefore beyond the Board's authority. In the alternative, the Company takes issue with the Board's decision to credit Cruz rather than his supervisor and with the Board's interpretation of the supervisor's statement.

## II. Analysis

In reviewing the Board's decision, we defer to the Board's findings of fact insofar as they are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). We defer to the Board's construction of the NLRA if it is "reasonably defensible," though not if the Board failed to apply the proper legal standard. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) (citations omitted).

## A. Unlawful Discharge of Striking Employees

The law is well settled that an employer may permanently replace an employee who is participating in an economic strike. *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938); *see also NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 790, 110 S.Ct. 1542, 1551, 108 L.Ed.2d 801 (1990); *Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants*, 489 U.S. 426, 433–34, 109 S.Ct. 1225, 1230–31, 103 L.Ed.2d 456 (1989) (collecting cases). An employer may not discharge a striking employee, however, until the employer has engaged a replacement worker to fill the employee's position. *NLRB v. International Van Lines*, 409 U.S. 48, 52, 93 S.Ct. 74, 77, 34 L.Ed.2d 201 (1972). If an employer gives a striker notice that he has been discharged before that time, then the employer has committed an unfair labor practice and may be required to reinstate the worker with back pay. *Id.; see also NLRB v. Mars Sales & Equip. Co.*, 626 F.2d 567, 572–74 (7th Cir.1980).

In this case the operations manager of Noel Foods told employees less than two hours before the strike began that those who walked out would be permanently replaced and that the Company "had hired" replacement workers; the Board concluded that a reasonable employee would have understood those statements to be notice that he would be removed from his position as soon as he walked off the job. If Robbins's statements can reasonably be understood as a notice of discharge effective when the employee joined the strike—which we will assume although we are less than fully confident—then that discharge would be unlawful only if it occurred before the employee had in fact been permanently replaced. In other words, with respect to the four striking night-shift employees, the Company's conduct was unlawful only if at the time the discharge became effective—that is, at midnight when they walked off the job—the positions held by those employees were vacant. Neither the Board nor the ALJ, however, made findings to that effect; indeed, the record contains evidence that far more replacement workers

reported for work at midnight than were needed at that time. Similarly, the employees who spoke with Robbins by telephone that night could not have been effectively discharged until they failed to show up for their shifts the next day; there is no evidence, however, that replacement workers were not available to step into those strikers' jobs as soon as the day shift began. Although the Board adopted the ALJ's general observation that at the time Robbins made his statements "the task of marshalling a measurably complete replacement program was not yet even under way," neither the ALJ nor the Board points to evidence that any one of the ten employees who were effectively discharged as of the time they went on strike was not immediately and permanently replaced. Without the support of substantial evidence on this point, the Board's holding that the statements effected unlawful discharges cannot be sustained.

Rather than analyze this case in terms of whether the employees were replaced by the time they were discharged—that is, when they went on strike—the Board focused upon whether Robbins's statements that the Company had hired permanent replacements were false when he made them. The Board derived this approach from its decision in *American Linen*, upon which it relied for the proposition that "a false statement that permanent replacements had been obtained effectively resulted in withholding from strikers the right to return to their unoccupied jobs solely because they went on strike." 315 N.L.R.B. at 907. Accordingly, the Board held that the employer in this case effectively discharged the striking employees because its statements that replacement workers had been hired were made "at a time when the Respondent had not in fact hired permanent replacements for all the potential strikers." *Id.* at 908.

The Board's reliance upon *American Linen* is misplaced. In *American Linen* the employees had voted for an economic strike to begin a few days after the vote. The general manager of the employer discovered the plan when he arrived for work at 6:15 a.m. on the appointed day only to find that the strike had already begun. He quickly drafted a handwritten notice and distributed it to the picketers between 6:30 and 6:45 a.m. The notice read, "You have until 7 a.m. [today] to return to work. If you have not, you are permanently replaced." 945 F.2d at 1430. The Board found that although the employer "had prepared for a strike by accepting job applications and by preparing a list of supervisory personnel from other plants who could come to [the plant] to assist, there was not sufficient time in the early morning hours of October 2 for these plans to go into effect." *Id.* at 1432.

The Board construed the notice as an unlawful discharge effective at 7:00 a.m. According to the Board, an employer's right under *Mackay Radio* permanently to replace economic strikers "does not extend to withholding from them the right to return to their unoccupied jobs simply because they have gone out on strike. A false statement that permanent replacements have been obtained accomplishes this unlawful end." 297 N.L.R.B. at 137 (citing *Mars Sales & Equip.*, 626 F.2d at 573). Because the employer had not and could not have actually hired permanent replacements by the time indicated in the notice, the employer "in fact made a false statement when it indicated that striking employees would actually be permanently replaced by 7 a.m. . . . When the time specified in the ultimatum arrived without the [employer's] having corrected its erroneous replacement claim and without the employees' having yielded to the threat by abandoning their strike at the outset, the unlawful terminations occurred." 297 N.L.R.B. at 137.

In enforcing the order, the Eighth Circuit took an approach significantly different from that of the Board: the court did not rely at all upon the falsity of the employer's statement about replacements at the time the statement was made. Because the Board had concluded that the employer could not have hired and did not in fact hire permanent replacements by 7:00 a.m.—a finding supported by substantial evidence—the court simply treated the notice as a discharge of economic strikers whose jobs had not been promised to replacement workers at the time of their discharge. 945 F.2d at 1432–33 (cit-

ing, inter alia, *Mars Sales & Equip.*, 626 F.2d at 574).

■ In this context "discharge" is a term of art. When an economic striker is permanently replaced, he is "discharged" only in the sense that he is separated from his prior position. The replaced striker remains an "employee" within the meaning of the Act and, if he offers unconditionally to return to work, is entitled to reinstatement should his former (or a substantially equivalent) position become vacant. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545–46, 19 L.Ed.2d 614 (1967); *Gibson Greetings, Inc. v. NLRB*, 53 F.3d 385, 389 (D.C.Cir.1995); *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 (D.C.Cir.1990); *cf. L.A. Water Treatment, Div. of Chromalloy Amer. Corp. v. NLRB*, 873 F.2d 1150 (8th Cir.1989) (addressing whether employer's statement "you are no longer employed" effectively severed employment relationship altogether by implying that striker was no longer an "employee" with a continuing right to reinstatement). Without much discussion, however, and without concluding that a request for reinstatement would have been futile, both the Board and the Eighth Circuit held that an employer unlawfully "discharges" even a striker who has not sought reinstatement when the employer falsely tells him that he has been permanently replaced. *See* 297 N.L.R.B. at 137; 945 F.2d at 1433. In this case the Company suggests that the Board's decision in *American Linen* may be wrong because the strikers never sought and therefore were never denied reinstatement, but the Company explicitly stops short of making that argument. We therefore confine our decision to whether Robbins's statements effectively discharged the employees before their positions were filled by replacement workers; we do not address whether the employees' failure to seek reinstatement undermines the Board's holding that they were unlawfully discharged.

■ Assuming that the Eighth Circuit was correct in its analysis, we think that the Board erred in concluding that this case falls within the rule of *American Linen* on the ground that the statement by Robbins was false when made. The relevant questions are instead whether the statement conveyed the impression that the employees would be replaced as soon as they went on strike and whether they were in fact replaced at that time. Indeed, even under the Board's characterization of *American Linen* in this case, a false statement is unlawful only if it "effectively result[s] in withholding from strikers the right to return to their unoccupied jobs," 315 N.L.R.B. at 907; yet the Board failed to answer the question whether the strikers' jobs at Noel Foods were ever unoccupied. Accordingly, *American Linen* provides no support for the Board's focus upon whether the statements about permanent replacements were false when made rather than upon whether the employer actually carried out its stated intention by the appointed time.

Even if we approved of the Board's emphasis upon the question whether the statements were false when made, however, we are not persuaded, based upon the Board's factual findings, that the statements were actually false. When Robbins told the employees that the Company had hired permanent replacements, the Company had indeed arranged for permanent replacements. Noel Foods had previously contracted with an employment agency to prepare a roster of people ready to serve as replacement workers in the event of a strike, and the agency had in fact identified 20 workers who were ready, willing, and able. Shortly after the employees voted to strike, the Company's human resources manager contacted the agency and told them to provide as many of these replacement workers as possible by midnight. Fifteen replacements reported for work, and those who were not placed in positions that evening were asked to return in the morning. (In addition, some of the Company's employees from outside the bargaining unit were available to replace the strikers, and their permanent transfer into unit jobs would have been consistent with their normal career paths.)

Supposing that a replacement worker cannot actually be "hired" until a worker goes on strike, the evidence indicates that the Company did everything it could do short of actual "hiring" to ensure that a significant

number of replacement workers would be available to report to work when the strike began. Accordingly, even upon the Board's analysis, we are not persuaded that any Noel employee was unlawfully discharged by reason of Robbins's statements.

■ Nor are we persuaded by the Board's argument on appeal that Robbins's statements were unlawful because the Company could not possibly have had enough workers lined up to replace all the potential strikers—that is, the entire bargaining unit—as soon as the strike began. Again, the relevant question is whether any employee was actually discharged before he was replaced. By making a broad statement about permanent replacements in advance of their being formally hired, an employer takes a risk that the number of strikers it effectively discharges will exceed the number of replacements available; the employer's gamble is not unlawful, but it may be unsuccessful—if the number of replacement workers turns out to be too low.

In this case, as the Board recognized, the only employees who were effectively discharged by Robbins's statements were those who both heard the statements and went out on strike. *See* 315 N.L.R.B. at 907 ("those night crew employees who did not yield to the unlawful threat and engaged in the strike were effectively terminated"). Because only four night-shift employees struck at midnight and fifteen permanent replacements (along with several non-unit employees) were available to begin work at that time, it appears that the Company's gamble paid off; none of the night-shift employees was discharged unlawfully for want of an immediate replacement. Likewise, there is no evidence, let alone substantial evidence, that the striking day-shift employees who spoke with Robbins by telephone were not replaced immediately when their shift began.

### B. Unilateral Implementation of Contract Terms

■ When a company and a union reach a good faith impasse in their negotiations, the company may implement the terms of the last proposal it put on the bargaining table. *American Fed'n of Television & Radio Art-*

*ists v. NLRB*, 395 F.2d 622, 624 (D.C.Cir. 1968). In this case, however, the Board found that the Company was precluded from making unilateral changes only because the parties had reached impasse "in the context of serious unremedied unfair labor practices that affect[ed] the negotiations," 315 N.L.R.B. at 911—namely, the discharge of the ten employees who went on strike after hearing Robbins's statements. Having overturned the predicate violations, therefore, we must also reverse the Board's conclusion that the Company refused to bargain in good faith, in violation of §§ 8(a)(1) and 8(a)(5), when it declared an impasse and acted accordingly.

### C. Constructive Discharge

Finally, the Board found that employee Mitch Cruz had been constructively discharged when the supervisor who called to offer him reinstatement told him that the Company was "a nonunion shop from now on." The Company advances three objections: first, the statement, taken in context, meant only that there was no CBA in place; second, the evidence does not support the Board's reliance upon the testimony of one witness over that of another; and third, the allegations involving Cruz were outside the scope of the charge and were therefore beyond the Board's authority to investigate. We conclude that these objections were not properly preserved for presentation to the court.

■ Section 10(e) of the NLRA provides that "[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). In this case the Company was not on notice that the Board would be considering Cruz's discharge as an unfair labor practice until the Board released its decision: the constructive discharge of Cruz was arguably outside the scope of the charge, was not alleged in the General Counsel's amended complaint, was not a specific focus of the litigation, and was not considered as a possible unfair labor practice by the ALJ. The Company, however, had the opportunity, and

therefore the obligation, to raise its objections in a timely petition for rehearing or reconsideration. *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982). Having identified no "extraordinary circumstances" that prevented it from presenting its objections in the appropriate manner before the Board, the Company is barred from asserting them in a petition for review before this court.

■ The Company does offer two reasons why this court should excuse its failure to preserve the last of its three objections in the matter of Cruz, but neither is persuasive. First, the Company asserts that its third objection—that the Board's finding that the Company unlawfully discharged Cruz is beyond the scope of the Union's charge—is essentially a challenge to the Board's statutory authority and jurisdiction over this matter. *See Drug Plastics & Glass Co. v. NLRB,* 44 F.3d 1017, 1022 (D.C.Cir.1995); *Lotus Suites, Inc. v. NLRB,* 32 F.3d 588, 590–92 (D.C.Cir.1994); *see also Nickles Bakery,* 296 N.L.R.B. 927, 1989 WL 224354 (1989). This is not, however, an instance in which the Board has "patently traveled outside the orbit of its authority," *NLRB v. Ochoa Fertilizer Corp.,* 368 U.S. 318, 322, 82 S.Ct. 344, 347–48, 7 L.Ed.2d 312 (1961), leaving us with, "legally speaking, no order to enforce," *NLRB v. Cheney California Lumber Co.,* 327 U.S. 385, 388, 66 S.Ct. 553, 554, 90 L.Ed. 739 (1946). As long as the Board is not purporting to exercise an authority "entirely foreign to and inappropriate for this particular agency," we will regard even a challenge to the jurisdiction of the Board as a question of law to be raised first before the agency. *Cf. Presque Isle TV Co. v. U.S.,* 387 F.2d 502, 506 (1st Cir.1967).

■ Second, the Company contends that it would have been futile to present the Board with a petition for rehearing on the ground that the Cruz allegations were outside the scope of the charge. The Board had already concluded that for purposes of the notice required by due process, the Cruz discharge was closely enough related to the allegations in the complaint; moreover, the Board found that the matter had been fully litigated at the hearing. *See* 315 N.L.R.B. at 910 n. 29; *cf. NLRB v. FLRA,* 2 F.3d 1190, 1196 (D.C.Cir.1993) ("almost *sua sponte* nature" of agency's decision coupled with "patent futility of a rehearing petition constitutes an extraordinary circumstance that excuses the ... failure to object"). We conclude that the Board's consideration of the legally distinct issue of the notice required for due process was not enough to excuse the Company from presenting the argument that the Board did not have jurisdiction to reach the Cruz matter. The Board betrayed no awareness either that the Cruz matter may have been beyond the scope of the charge or that there may have been a problem with the Board's jurisdiction. We therefore cannot conclude that a petition for reconsideration would have been patently futile.

### III. Conclusion

■ The Board's determination that the Company unlawfully discharged ten employees before they were permanently replaced is not supported by substantial evidence and is based upon a misapplication of the *American Linen* case. Because the Board did not find that the Company in fact failed to replace the ten strikers as soon as they went on strike, we will not enforce that portion of its order. We therefore must reject also the Board's corollary proposition, that the Company had not reached a lawful impasse when it unilaterally changed the terms and conditions of employment.

The Company's various challenges to the remaining portion of the Board's order, relating to the constructive discharge of Mitch Cruz, are not properly before the court. Therefore the order is, to that extent,

*Enforced in part.*